**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| **SANJEL (USA) INC.,** | § | **Case No. 16-50778** |
| Debtor in a foreign proceeding. | § | **Chapter 15** |
| | § | |
| In re: | § | |
| **SANJEL CORPORATION,** | § | **Case No. 16-50784** |
| Debtor in a foreign proceeding. | § | **Chapter 15** |
| | § | |
| In re: | § | |
| **SURETECH GROUP LTD.,** | § | **Case No. 16-50786** |
| Debtor in a foreign proceeding. | § | **Chapter 15** |
| | § | |
| In re: | § | |
| **SANJEL ENERGY SERVICES (USA) INC.,** | § | **Case No. 16-50795** |
| Debtor in a foreign proceeding. | § | **Chapter 15** |
| | § | |
| In re: | § | |
| **SURETECH COMPLETIONS (USA) INC.,** | § | **Case No. 16-50789** |
| Debtor in a foreign proceeding. | § | **Chapter 15** |
| | § | |
| In re: | § | |
| **SANJEL CAPITAL (USA) INC.,** | § | **Case No. 16-50783** |
| Debtor in a foreign proceeding. | § | **Chapter 15** |
| | § | |
| In re: | § | |
| **TERRACOR GROUP LTD.,** | § | **Case No. 16-50790** |
| Debtor in a foreign proceeding. | § | **Chapter 15** |
| | § | |
| In re: | § | |
| **TERRACOR (USA) INC.,** | § | **Case No. 16-50791** |
| Debtor in a foreign proceeding. | § | **Chapter 15** |
| | § | |
| In re: | § | |
| **TERRACOR RESOURCES (USA) INC.,** | § | **Case No. 16-50793** |
| Debtor in a foreign proceeding. | § | **Chapter 15** |
| | § | |
| In re: | § | |
| **TERRACOR LOGISTICS (USA) INC.,** | § | **Case No. 16-50794** |
| Debtor in a foreign proceeding. | § | **Chapter 15** |
| | § | **Joint Administration Pending** |

**EXPEDITED PETITION FOR RECOGNITION AS FOREIGN MAIN PROCEEDING PURSUANT TO SECTIONS 1515 AND 1517 OF THE UNITED STATES BANKRUPTCY CODE AND RELATED RELIEF**

PricewaterhouseCoopers Inc. ("PwC" or the "Monitor"), as the court-appointed foreign representative for Sanjel Corporation ("Sanjel Corp."), Suretech Group Ltd. ("Suretech"), Sanjel Energy Services (USA) Inc. ("Sanjel Energy"), Sanjel (USA) Inc. ("SUSA"), Suretech Completions (USA) Inc. ("Suretech USA"), Sanjel Capital (USA) Inc. ("Sanjel Capital"), Terracor Group Ltd. ("Terracor Group"), Terracor (USA) Inc. ("Terracor USA"), Terracor Resources (USA) Inc. ("Terracor Resources") and Terracor Logistics (USA) Inc. ("Terracor Logistics") (collectively, Sanjel Corp., Suretech, Sanjel Energy, SUSA, Suretech USA, Sanjel Capital, Terracor Group, Terracor USA, Terracor Resources, and Terracor Logistics are collectively referred to as the "Chapter 15 Debtors") in the proceeding pending in the Court of Queen's Bench of Alberta, Judicial Centre of Calgary (the "Canadian Court" and the "Canadian Proceedings") under the Companies' Creditors Arrangement Act (the "CCAA"), by and through its undersigned counsel, respectfully files the official form petition and this petition (together, the "Petition") pursuant to section 1515 of title 11 of the United States Code (the "Bankruptcy Code") for entry of an order recognizing the Canadian Proceedings as foreign main proceedings pursuant to section 1517 of the Bankruptcy Code, thereby granting related relief pursuant to section 1520 of the Bankruptcy Code and additional relief pursuant to section 1521 of the Bankruptcy Code. In the alternative, should the Court not recognize the Canadian Proceedings as foreign main proceedings, either in whole or in part, the Monitor seeks recognition of the Canadian Proceedings as foreign nonmain proceedings, as defined in section 1502(5) of the Bankruptcy Code, and seeks additional relief available under section 1521 of the Bankruptcy Code.

2

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and (b) and 1334(a) and (b) and 11 U.S.C. §§ 109 and 1501 of the Bankruptcy Code.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1410 and 1408.

## INTRODUCTION

2.      The Chapter 15 Debtors are part of a group of Canadian-based companies who have filed for restructuring under the Companies' Creditors Arrangement Act in Canada, which are foreign proceedings within the meaning of the United States Bankruptcy Code.  The Monitor is the court-appointed foreign representative, and as such, is a foreign representative within the meaning of the United States Bankruptcy Code.  As the court appointed foreign representative of the Chapter 15 Debtors, the Monitor seeks recognition of the foreign proceedings as foreign main proceedings under 11 U.S.C. §§ 1515 and 1520.

3.      The Monitor also seeks certain injunctive relief pursuant to 11 U.S.C. §§ 1520 and 1521 to protect the Chapter 15 Debtors and their assets and creditors.

## EXPEDITED RELIEF REQUESTED

4.      "A petition for recognition of a foreign proceeding shall be decided upon at the earliest possible time."  11 U.S.C. § 1517(c).  The Monitor seeks expedited relief because the Debtors are on an expedited schedule to market their assets as part of their Canadian Proceedings.  Also, as discussed in more detail herein, a meeting is currently scheduled for April 14, 2016 in regard to the Senior Bonds (as defined below) at which the holders of the Senior Bonds will be asked to vote on, among other things, instructing the Trustee (as defined below) to immediately begin exercising remedies against the Chapter 15 Debtors, a process the Monitor

3

and the Chapter 15 Debtors believe will be detrimental to the Chapter 15 Debtors and other creditors.  Additionally, the Syndicate (as defined below) has sent the Enforcement Notice (as defined below) to the Chapter 15 Debtors which, under Canadian law, enables the Syndicate to begin enforcing remedies against the Chapter 15 Debtors.  Representatives of the Syndicate advised representatives of the Chapter 15 Debtors at the time of delivery of the Enforcement Notice that it was being delivered to preserve rights of the Syndicate.  Nonetheless, the Monitor and the Chapter 15 Debtors are particularly concerned that if enforcement actions are commenced by the Senior Bonds and/or the Syndicate (or other creditors), such actions could have severe detrimental effects, including on the sale process the Chapter 15 Debtors have been pursuing, and are in the process of completing.

## SUPPORT FOR THIS PETITION

5.    The Monitor attaches the following Exhibits to this Petition.

| Exhibit | Description | Comment |
|---------|-------------|---------|
| A | Form of Order Granting Expedited Petition For Recognition As Foreign Main Proceeding Pursuant To Sections 1515 And 1517 Of The United States Bankruptcy Code and Related Relief | |

6.    The Monitor also requests that the Court take judicial notice of its files in this case, and relies upon *Monitor's Notice Of Filing Of Documents In Support Of First Day Motions* (the "<u>Notice</u>"), filed contemporaneously herewith.

## BACKGROUND

## I.    THE CORPORATE STRUCTURE OF THE SANJEL GROUP

7.    Sanjel Corp. is the parent corporation of the Sanjel Group (as defined below).  It is a private company whose shares are owned 100% by MacDonald Group Ltd., a Named Alberta Corporation formed under the laws of Alberta, Canada. It is a corporation incorporated

4837-7358-3152.1
113232\000001
04/04/2016 3:58 PM

under the *Alberta Business Corporations Act*, R.S.A. c. B-9, as amended (the "ABCA") on November 7, 1980 with its principal place of business located at 200, 505-2nd Street, SW, Calgary, Alberta T2P 1N8 (the "Calgary Head Office"). All other of the Chapter 15 Debtors are wholly owned subsidiaries, directly or indirectly, of Sanjel Corp.  Suretech is a corporation incorporated under the ABCA on December 23, 2011. Sanjel Energy is a corporation incorporated under the laws of the State of Delaware.  SUSA is a corporation incorporated under the laws of the State of Montana on October 16, 1998. Suretech USA is a corporation incorporated under the laws of the State of Delaware on December 5, 2011.  Sanjel Capital is a corporation incorporated under the laws of the State of Delaware on May 25, 2011.  Terracor Group is a corporation amalgamated under the ABCA on May 1, 2015. Terracor USA is a corporation incorporated under the laws of the State of Delaware on May 17, 2011. Terracor Resources is a corporation incorporated under the laws of the State of Delaware on May 17, 2011. Terracor Logistics is a corporation incorporated under the laws of the State of Delaware on May 17, 2011.  All of the Chapter 15 Debtors have their principal executive office located at the Calgary Head Office.  Except for SUSA, the registered office for the Chapter 15 Debtors incorporated in the United States is c/o Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  The registered office for SUSA is c/o Corporation Service Company, 26 West Sixth Avenue, P.O. Box 1691, Helena, Montana 59624-1691.

8.      In addition to the Chapter 15 Debtors, the Sanjel family of companies includes entities formed for the purpose of conducting or facilitating business in jurisdictions other than Canada and the United States.  These entities and the jurisdiction of formation (shown in brackets) are (1) Sanjel Canada Ltd. [Alberta] ("Sanjel Canada"), (2) 1937171 Alberta, Ltd. [Alberta] ("1937171"), (3) 1507781 Alberta, Ltd. [Alberta] ("1507781"), (4) Corporacion De

5

Asentamientos Estructurales, S.A. de C.V. [Mexico] ("CDAE"), (5) Servicios Integrales Sanjel, S. de R.L. de C.V. [Mexico] ("SIS"), (6) Riverbend Technology Holdings Ltd. [Alberta] ("Riverbend"), (7) Sanjel Middle East Ltd. [Barbados] ("Sanjel ME"), (8) Sanjel Energy Services DMCC [United Arab Emirates] ("Sanjel DMCC"), (9) Sanjel North Iraq Limited [Barbados] ("Sanjel Iraq"), (10) Sanjel Middle East Operations Ltd. [Barbados] ("Sanjel ME Operations"), (11) Sanjel International Saudi Arabia Ltd. [Saudi Arabia] ("Sanjel SA"), (12) Sanjel Latin America Limited [Barbados] ("Sanjel Latin America"), (13) Sanjel Energy Services S.A. de C.V. [Mexico] ("Sanjel ESSA"), (14) Sanjel Technical Services Mexico S.A. de C.V. [Mexico] ("Sanjel TSM"), (15) San Oilfield Services Mexico S.A. de C.V. [Mexico] ("Sanjel OSM"), and (16) Suretech Completions Canada Ltd. [Alberta] ("Suretech Canada"). A diagram showing the corporate organizational structure is attached to the Notice as Exhibit G. Sanjel Canada, Sanjel ME, Suretech Canada and Sanjel LA are also debtors under the CCAA and with the Chapter 15 Debtors comprise the "Sanjel Group". The principal executive office for the Sanjel Group is the Calgary Head Office. The other Sanjel entities are not debtors under the CCAA.

## II.    DIRECTORS AND SENIOR MANAGEMENT OF SANJEL CORP

9.      The identity of the executive officers and directors of each of the Chapter 15 Debtors (and other companies not comprising the Chapter 15 Debtors) is set out in Exhibit H attached to the Notice (subject to Darin MacDonald's resignations, as described below). Darin MacDonald, who was the sole director of all the Canadian and U.S. companies in the Sanjel Group (until his resignations, as described below), is a resident of Calgary, Alberta. In addition, Warren Zemlak and Paul Crilly (who are, together with Darin MacDonald, all of the senior

4837-7358-3152.1
113232\000001
04/04/2016 3:58 PM

executive officers of the Canadian and U.S. companies in the Sanjel Group) are also residents of Calgary, Alberta.

### III. THE INTEGRATED BUSINESS OF THE CHAPTER 15 DEBTORS AND CENTER OF MAIN INTEREST ("COMI")

10.     The intention of the Chapter 15 Debtors in commencing these proceedings is to achieve a Court-approved restructuring of the entire Sanjel Group, which may involve the restructuring, sale and/or recapitalization of some or all of the entities in the Sanjel Group. Because of the highly integrated nature of the Sanjel Group's business and the presence of assets and operations in Canada and the U.S., the Chapter 15 Debtors anticipate that highly-coordinated proceedings are required.  Therefore, the Sanjel Group's intention is to restructure or otherwise complete a sale process under the CCAA and under Chapter 15 of the *U.S. Bankruptcy Code*.

11.     The Sanjel Group's business was established in 1982.  For the first 16 years of its existence, it operated only in Canada.  In 1998, the business expanded into the United States.  As of the date of this Petition, the Chapter 15 Debtors had over $500,000,000 in assets in the United States (at book value), with more than 50% of such assets located in Texas.  Further expansions occurred in 2006 to Iraq and other Middle Eastern countries, in 2008 to Saudi Arabia, and in 2009 to Latin America.

12.     Alberta Treasury Branches ("ATB"), represented by personnel in Calgary, is the agent of the Syndicate (as defined and discussed below) that provides secured loans to the Sanjel Group.  ATB has been the Sanjel Group's banker from the time the business began in Canada some 34 years ago.

13.     The Sanjel Group's business is fully integrated, with the "nerve center" for the entire group based in Calgary.  As noted above, all of the directors and senior executive officers

4837-7358-3152.1
113232\000001
04/04/2016 3:58 PM

of the Canadian and U.S. Sanjel companies are residents of Calgary.  All the senior executives live and work in Calgary.  The senior executive officers of the Sanjel Group are:

 (a) Darin MacDonald - Chief Executive Officer ("CEO"), President, and Secretary of all the Canadian and U.S. companies in the Sanjel Group (and Treasurer of a number of them);

 (b) Paul Crilly - Chief Financial Officer ("CFO") of all the Canadian and the U.S. companies in the Sanjel Group; and

 (c) Warren Zemlak - Chief Operating Officer ("COO") of Sanjel Corp;

(collectively, the "Management Team").

 14. Additionally, almost all of the members of the executive management team of the Sanjel Group are residents of Calgary and perform their duties out of the Calgary Head Office. Those executive management positions (including the Sanjel Group entity that pays such executives salary, and the Management Team member to whom such executive directly reports) are:

 (a) Vice-President, Corporate HSE & Quality, Sanjel Canada Ltd. (reports to Warren Zemlak);

 (b) Vice-President, Canadian Business Unit, Sanjel Canada Ltd. (reports to Warren Zemlak);

 (c) Vice-President, Corporate Human Resources, Sanjel Canada Ltd. (reports to Darin MacDonald);

 (d) Director of Legal, Sanjel Canada Ltd. (reports to Darin MacDonald);

 (e) Vice-President, Corporate Information Systems, Sanjel Canada Ltd. (reports to Darin MacDonald);

 (f) Director, Corporate Tax, Sanjel Canada Ltd. (reports to Paul Crilly);

 (g) Director, Corporate Accounting, Sanjel Canada Ltd. (reports to Paul Crilly);

 (h) Director, Corporate Treasury, Financial Planning & Analysis, Sanjel Canada Ltd. (reports to Paul Crilly);

 (i) Director, Corporate Supply Chain, Sanjel Canada Ltd. (reports to Warren Zemlak); and

4837-7358-3152.1
113232\000001
04/04/2016 3:58 PM

(j)     Vice-President, Terracor Group Limited (reports to Darin MacDonald).

15.     The only executives of the Sanjel Group who are not Calgary residents and do not work out of the Calgary Head Office are located in the U.S. but report directly to the Management Team in Calgary.   These executives (including the location from which such executive works, the Sanjel Group entity that pays such executive's salary, and the Management Team member to whom such executive directly reports) are:

(a)     Vice-President of the USA Business Unit (Denver, SUSA, reports to Warren Zemlak);

(b)     Advisor, Corporate Operations Support (Denver, SUSA, reports to Warren Zemlak);

(c)     Vice-President, Corporate Client Solutions (Denver, SUSA, reports to Warren Zemlak); and

(d)     Director – Reservoir Solutions (Denver, SUSA, reports to Warren Zemlak) (although the majority of the reservoir team that reports to this position is located in Calgary).

16.     The Management Team develops all short, medium and long-term corporate strategies for the entire Sanjel Group. All vice-presidents (which, other than the senior executive officers, are the most senior positions in each business unit in the Sanjel Group) report directly to the Management Team.   Annual and quarterly budgets for all the entities in the Sanjel Group are reviewed and approved by the Management Team in Calgary. Staff in all of Sanjel Group's business units are subject to fixed expenditure authority limits which are relatively low.   All expenditures above the limit must be approved by the Management Team.   Between the annual and quarterly budgets set by the Management Team and the expenditures authority limits, there is virtually no non-budgetary expenditure discretion at the business unit level.   All such discretion is exercised at the Management Team level.

4837-7358-3152.1
113232\000001
04/04/2016 3:58 PM

17.     All capital allocation decisions across the entire Sanjel Group are developed by the Management Team and approved by the Management Team. The vice-presidents of all the business units in Canada and U.S. report to the CEO or COO in Calgary. The vice-presidents of the business units in all jurisdictions execute the decisions made by the Management Team in Calgary. The CEO and COO are typically involved in all major negotiations with large clients regardless of the business entity that serves those clients or the jurisdiction in which their projects are located. The material terms of all major contracts require approvals by the Management Team. The relationships with all of the Sanjel Group's major clients involve the Management Team.

18.     Financial reporting for the Sanjel Group is done on a consolidated basis and the accounting staff in the Calgary Head Office generate the consolidated financial statements and work with the auditors, who are located in Edmonton, Alberta. The business units in the Sanjel Group are responsible for data entry and preliminary preparation/analysis of the business unit financial statements and they then submit reports to the corporate accounting group located in the Calgary Head Office.

19.     Supply chain strategy and direction for the entire Sanjel Group are centralized in Calgary. The Director, Corporate Supply Chain directs all supply chain procurement and logistics from the Calgary Head Office, for all the Sanjel Group entities.

20.     All of the following policies, procedures, operating manuals and operating practices are developed, updated and administered in the Calgary Head Office, and are applied across all the Sanjel Group entities:

(a)     Human Resources - including employees policies and procedures, benefits, wellness, confidentiality and privacy policies;

(b)     Corporate Accounting policies;

10

(c)     Code of Ethics;

(d)     Corporate Standards;

(e)     Information and Telecommunications policies and procedures;

(f)     Engineering and technology policies and procedures, including lab safety, training and development, and product development; and

(g)     Marketing and Communications policies and procedures.

21.     The health, safety and environment ("HSE") and quality control functions for all the entities in the Sanjel Group are centralized in Calgary, at the Calgary Head Office. All corporate and employee training for all the employees of the entities in the Sanjel Group is centralized out of the Sanjel Group's state of the art professional park, which was opened in Calgary in 2007 (the "Pro Park"). All training and development programs for operational personnel throughout the Sanjel Group are developed in Calgary and training classes for employees of all the entities are mostly held in Calgary (although safety, quality, local regulatory and driver training takes place in the U.S. and Saudi Arabia locations). All leadership development programs are developed for the Sanjel Group in Calgary and administered out of the Pro Park facility.

22.     Operational support for the entire Sanjel Group runs out of the Pro Park facility in Calgary, for all the jobs conducted by the entities in the Sanjel Group. Operational support includes:

(a)     24-hour a day equipment support;

(b)     all Corporate Service Line engineering advisors, who are responsible for the oversight of operating practices, technology applications and technical support, reside in Calgary and work out of the Pro Park facility;

(c)     the 24-hour a day technology centre laboratories which supports the chemistry testing, formulation and quality controls of the global operations operate out of the Pro Park facility; and

11

(d)    the Reservoir Solutions Group, which is comprised of technical experts in Geo-modeling, Geomechanics, Geology & Geophysics, Petrophysics, Reservoir Engineering and Completion modeling operates primarily out of the Pro Park facility. This multi-disciplinary team collaborates directly with clients in all jurisdictions to optimize their field development planning and exploitation using the Sanjel Group's proprietary workflows and models.

23.    The following functions take place at the Pro Park facility, for the benefit of all the entities in the Sanjel Group:

(a)    significant proprietary design, engineering and in-house construction of equipment used in the Sanjel Group's operation are performed at the Pro Park Facility;

(b)    the Sanjel Group's proprietary products are developed, tested and sustained in the Pro Park facility, including the development of patents and intellectual property; and

(c)    all of the Sanjel Group's technology development laboratories are located in the Pro Park facility.

24.    All technology and information systems are designed, implemented and maintained by the information systems team whose members are all located in the Pro Park facility. That team operates a 24-hour help line from the Calgary Head Office which supports information technology for all the entities in the Sanjel Group, in all jurisdictions.

25.    The Sanjel Group has developed significant intellectual property (the "IP") related to its business operations, with patents held and pending in Canada, the U.S., Mexico, Russia and pursuant to the Patent Cooperation Treaty ("PCT"). The vast majority of the patents are held by Canadian entities in the Sanjel Group: either Sanjel Corp., Sanjel Canada or Suretech Canada (with a small number being held by Riverbend, an Alberta corporation in the Sanjel Group that is not a Chapter 15 Debtor or party to the CCAA proceedings). All the other entities in the Sanjel Group who utilize this valuable intellectual property, do so by way of license arrangements with the Canadian entities in the Sanjel Group that own the intellectual property. None of the Sanjel Group's patents are held by the U.S. entities in the Sanjel Group and the U.S. entities in the

12

Sanjel Group depend on patents owned primarily by the Canadian entities.  The use of the IP is critical to the ongoing business operations of all the entities in the Sanjel Group, in general, and the Chapter 15 Debtors, in particular.

## IV.  EMPLOYEES

26.    As of February 29, the Sanjel Group had approximately 2,000 employees in Canada and the U.S. and another 208 within the Sanjel Group's Saudi Arabia joint venture (of which Sanjel Group's ownership is 49% and which is not an applicant in the CCAA Proceedings or a Chapter 15 Debtor).  The Sanjel Group previously had more than 4,300 employees but it has proactively reduced its workforce over the past 18 months in connection with cost-reduction measures to reduce ongoing operating, general and administrative expenses.  Approximately 1,100 employees are located in Canada and 900 employees are located in the U.S.  As noted above, except for three vice presidents, all of the officers and senior executives and all of the corporate support personnel are located in Canada.  Of the approximately 900 employees located in the United States, approximately 50% are located in the Western District of Texas.

## V.  BUSINESS OF THE SANJEL GROUP

### A.    General

27.    The Sanjel Group is headquartered in Calgary. Sanjel Corp, through its subsidiaries comprising the Sanjel Group, is an independent oil and gas services company. The Sanjel Group's pressure pumping operations provide fracturing, cementing, coiled tubing and reservoir solutions services in Canada, the U.S. and Saudi Arabia (via its joint venture). Through the Suretech entities, the Sanjel Group offers patented multistage completions system solutions for unconventional reservoir development with operations in the USA, Canada and the other international locations. Finally, through Terracor Group, the Sanjel Group distributes third-party

proppant through its strategically-located transloading facilities, and is in the process of developing a premium quality northern white fracturing sand mine to service the North American energy industry.

### B.  Fracturing Services

28.  The Sanjel Group believes it has the 11th largest fracturing services fleet (as measured by hydraulic horsepower capacity) in North America. Its fracturing fleet is one of the youngest in the oil and gas industry, with 67% of the Sanjel Group's fracking capacity being less than five years old.  The Sanjel Group has developed an efficient and reliable fleet that includes proprietary dry guar technology, pump controls, vertical onsite and storage, efficient iron handling systems and industry leading component life enablers. The Sanjel Group has increased its fleet efficiency by utilizing lower operating cost enablers such as proprietary component life equipment designs, centralized fleet maintenance, centralized logistics and bi-fuel capability on approximately twenty percent of its current fleet. The Sanjel Group has developed numerous innovative technologies including proprietary fracturing fluids, environmental solutions and completion/reservoir optimization workflows.

### C.  Cementing Services

29.  The Sanjel Group comprises one of Canada's largest energy cementing services, by market share, enterprise with targeted growth strategies in strategic U.S. resource plays. The Sanjel Group has developed a next generation cementing platform named the Sanjel Cyclonic Mixer, which accounts for approximately sixty-five percent of Sanjel Group's operating pump capacity.  The Sanjel Group supports its high volume cementing locations across North America with the industry's most efficient cement bulk plants (which are located in Canada and the

United States).  The Sanjel Group has a wide range of cement and acidizing products which range from proprietary specialized slurry systems to low cost solutions.

### D.    Coiled Tubing Services

30.    The Sanjel Group's coiled tubing services are focused on large diameter pipe required for unconventional resource plays.  The Sanjel Group is currently expanding its coiled tubing capabilities to include implementation of its SMARTclean technology, which is exclusive to the Sanjel Group in Canada and incorporates real time rheology measurements which reduce well cleanout and milling operational costs.

### E.    Sanjel Group's Customers

31.    A significant portion of the Sanjel Group's top clients are investment grade companies, complementing a very diverse customer base. Despite the very challenging current economic conditions in the energy services sector, the Sanjel Group has continued to focus on providing top of industry service to its clients and has continued to aggressively pursue new clients and new projects, with some recent successes. Continuing to provide top level service and maintain strong relationships with its client base will be key to any successful restructuring of the Sanjel Group. Because of the Sanjel Group's young fracturing fleet and high quality proprietary technologies for fracturing, cementing and coiled tubing, the Sanjel Group's businesses are well-positioned to emerge from CCAA proceedings as an effective and viable company.

### F.    Financial Statements

32.    A copy of Sanjel Corp's audited consolidated financial statements for the year ending April 30, 2015 are attached as Exhibit I to the Notice, and a copy of Sanjel Corp's

4837-7358-3152.1
113232\000001
04/04/2016 3:58 PM

unaudited interim draft consolidated financial statements for the nine months ended January 31, 2016 are attached to the Notice as Exhibit J.

### G.    Assets

33.    As of January 31, 2016, the book value of the Sanjel Group's consolidated assets (less intercompany loans and before potential impairments) was approximately CAD $1,438,788,000.  This includes consolidated current assets with an approximate book value of CAD $362,717,000 and consolidated non-current assets with an approximate book value of CAD $1,026,071,000.  These balances include 100% of the assets in the Saudi Arabia joint venture (in which the Sanjel Group only holds a 49% interest).

34.    Current assets as of January 31, 2016 (less intercompany loans and before potential impairments) included cash (approximately CAD $115,444,000),[1] accounts receivable (approximately CAD $142,215,000), income tax receivable (CAD $8,602,000) and inventory (approximately CAD $47,531,000).  Non-current assets (less intercompany loans and before potential impairments) included primarily the Sanjel Group's property and equipment carried at (approximately CAD $1,056,617,000), as well as equipment held for sale (approximately CAD $9,252,000) and investments (approximately CAD $813,000).  As of January 31, 2016, the approximate book value of the assets held by the Sanjel Group's primary operating subsidiaries was as follows (total assets, less intercompany loans, and before potential impairments):

(a)    Sanjel Canada – CAD $332,600,000;

(b)    SUSA – USD $169,300,000; and

(c)    Sanjel Capital – USD $20,300,000.

---

[1] As discussed in more detail below, the cash position of the Chapter 15 Debtors has significantly decreased since January 31, 2016.

4837-7358-3152.1
113232\000001
04/04/2016 3:58 PM

Fifty percent or more of the Chapter 15 Debtors' assets located in the United States are located in the Western District of Texas.

### H.    Liabilities

35.    As of January 31, 2016 the Sanjel Group had total consolidated liabilities of approximately CAD $1,104,602,000. The majority of the current liabilities include accounts payable (approximately CAD $134,646,000), indebtedness under the Facility (defined below), indebtedness to the Senior Bonds (defined below) (the amount outstanding under the Facility and the Senior Bonds were together, approximately CAD $890,638,000 plus interest payable of CAD $18,659,000) and future tax liability (approximately CAD $51,219,000). The Sanjel Group's equipment leases (described in greater detail below) are operating leases, and the liabilities associated with their equipment leases are therefore not included in the Sanjel Group's balance sheet. The Chapter 15 Debtors have approximately 729 trade vendors, of which, 424 (or 58%) are located in Canada.

*Credit Facility*

36.    Pursuant to an Amended and Restated Credit Agreement dated as of April 21, 2015 (the "Bank Credit Agreement"), Sanjel Corp and SUSA, as borrowers, are party to a secured credit facility with a three-year term (the "Facility") with a syndicate of twelve financial institutions led by ATB (collectively the "Syndicate"). A copy of the Bank Credit Agreement (with amendments, but excluding the lengthy exhibits and schedules appended thereto) is attached as Exhibit K to the Notice. Sanjel Corp and SUSA are the only borrowers under the Facility. Each of the other Chapter 15 Debtors have guaranteed the borrowings under the Facility including any cash management or hedge liabilities of the Sanjel Group with the

Syndicate, as security for which each Chapter 15 Debtor granted a security interest in substantially all of its present and future property to secure the repayment of the Facility.

37.     The Bank Credit Agreement is governed by Alberta law.  The total amount currently outstanding under the Bank Credit Facility is approximately CAD $396,700,000 (comprised of CAD $345,100,000 and USD $40,300,000 at an exchange rate of USD $1.00 to CAD $1.2971).

*Bank Accounts and Cash Management*

38.     All accounts are either held at a member of the Syndicate, an affiliate of a member of the Syndicate or with an institution which is subject to a control agreement with the Agent (excluding the accounts of the Saudi Arabia joint venture, in which the Sanjel Group has a minority interest).  The Chapter 15 Debtors utilize corporate credit cards provided by The Bank of Nova Scotia ("BNS"), a member of the Syndicate.  There is an approximate CAD $250,000 (CAD $140,000 and USD $80,000) limit on these credit cards and the Chapter 15 Debtors pay off the balance each day.  As part of its Cash Management System (as defined below), the Chapter 15 Debtors intend to continue using the corporate credit card program and BNS has agreed to let the Chapter 15 Debtors do so.

39.     The treasury function for all the entities in the Sanjel Group is centralized in the Calgary Head Office. The Sanjel Group's loan agreements (the Facility, and the Bond Agreement, as defined below) are negotiated and administered and compliance therewith is managed and controlled by the treasury group in the Calgary Head Office. Draw-downs, repayments and rollovers of borrowings under the Facility are initiated, approved and administered exclusively in the Calgary Head Office.

4837-7358-3152.1
113232\000001
04/04/2016 3:58 PM

40.     The treasury group in the Calgary Head Office also operates a centralized cash management system (the "Cash Management System") which is administered by the treasury group in the Calgary Head Office and includes the following functions:

(a)     despite the fact that Sanjel Corp and SUSA are both borrowers under the Facility, all drawings thereunder are made by Sanjel Corp, into an account with ATB in Calgary.  None of the officers or employees outside of the treasury group in the Calgary Head Office are authorized to make draws on the Facility;

(b)     the treasury group in the Calgary Head Office monitors the cash position of all the entities in the Sanjel Group (including in the U.S. and Barbados) and facilitates cash transfers as required to ensure that those entities can meet their daily cash requirements;

(c)     those cash transfers are made by way of intercompany loans from Sanjel Corp, administered by the treasury group in the Calgary Head Office;

(d)     when those other entities in the Sanjel Group (including in the U.S. and Barbados) have surplus cash, the treasury group in the Calgary Head Office sweeps cash from those entities back to repay to Sanjel Corp the intercompany loans;

(e)     all disbursements (i.e. ACH/EFT/cheques/wires) paid out by the entities in the Sanjel Group (including in the U.S. and Barbados) must be signed or electronically released by a member of the treasury team in the Calgary Head Office (except for petty cash disbursements); and

(f)     while some cash receipts are deposited at the field locations where they are received (including in the U.S. and Barbados), they are all reported to the treasury group in the Calgary Head Office and then administered by the treasury group as part of the centralized cash management system described above.

*Senior Bonds*

41.     On June 18, 2014, Sanjel Corp issued USD $300,000,000 principal amount 7.5% Senior Bonds due June 19, 2019 (the "Senior Bonds"). Sanjel Corp is required to pay the interest accruing under the Senior Bonds semi-annually on June 19 and December 19. A true copy of the Bond Agreement (the "Bond Agreement") related to the Senior Bonds, entered into between Sanjel Corp and Nordic Trustee ASA (the "Trustee") is attached to the Notice as Exhibit L.  The Senior Bonds are guaranteed by SUSA and the other Chapter 15 Debtors but are otherwise

19

unsecured. The Bond Agreement is governed by Norwegian law. The proceeds of the bond issuance were used by Sanjel Corp. primarily to (i) pay down borrowings under the Facility and permanently reduce the loan amounts thereunder and (ii) for working capital purposes.

*Intercompany Debt*

42.     As noted above, Sanjel Corp. makes intercompany loans to the operating entities in the Sanjel Group from time to time, as directed by the treasury group in the Calgary Head Office and depending on cash requirements. These intercompany loans are advanced and paid down from time to time, again as directed by the treasury group in the Calgary Head Office and depending on cash requirements.

*MacBain*

43.     All of the Canadian Sanjel Group entities lease substantially all of their business premises from MacBain Properties Ltd. ("MacBain"), which owns those premises. Similarly, all of the U.S. Sanjel Group entities except Terracor lease substantially all of their business premises from U.S. entities affiliated with MacBain (the "U.S. MacBain Companies").  MacBain and the U.S. MacBain Companies are owned privately, by shareholders that are related to, but are not identical to, the shareholders of Sanjel Corp.  The shareholders of MacBain, the U.S. MacBain and Sanjel Corp. are all related to are affiliated with the McDonald family.  The Sanjel Group's monthly lease expense owed to MacBain and the U.S. MacBain Companies is approximately CAD $4,250,000. MacBain and the U.S. MacBain Companies are also significant unsecured creditors of the Chapter 15 Debtors.

*Equipment Leases*

44.     The entities in the Sanjel Group have entered into a number of equipment leases, a brief summary of the most material of which is as follows:

20

(a)     Sanjel Corp has entered into an equipment lease with APEX Logistics, LLC, under which it leases covered hopper railcars;

(b)     Sanjel Corp and Sanjel Canada have, as co-lessees, entered into equipment leases with GE Canada Leasing Services Company ("GE Capital") and Wells Fargo Equipment Finance Company ("Wells Fargo") (assigned to Wells Fargo by BAL Global Finance Canada Corporation) under which they lease certain cement mixing and pumping equipment, chemical injection units, sand storage units, tractors and trailers, hydration units, skids, and related equipment. Under the Wells Fargo lease, Sanjel Corp and Sanjel Canada also lease certain tractors and trailers and related equipment;

(c)     SUSA has entered into equipment leases with General Electric Railcar Services Corporation ("GE Rail"), CAI Rail Inc. ("CAI") (such lease having been assigned, as to certain railcars, to CAI by GE Rail), ATEL Leasing Corporation ("ATEL") (such lease having been assigned, as to certain railcars, to ATEL by GE Rail), Pan American Railway Co. ("Pan American") and Trinity Industries Leasing Company ("Trinity"), under which it leases certain railcars; and

(d)     Sanjel Corp and SUSA have, together as co-lessees, entered into equipment leases with Banc of America Leasing & Capital, LLC ("Banc of America"), Wells Fargo Equipment Finance, Inc. ("Wells Fargo Inc.") and CIT Finance LLC ("CIT") (such lease having been purchased by CIT from First National Capital LLC), under which they lease certain pumping equipment, trailers and related equipment, certain fracturing and cement pumping equipment and related equipment and certain trailer mounted fracturing equipment, blender equipment and data trailers.

The total amount of all remaining payments under the Sanjel Group's equipment leases, including buy-out options, totals approximately CAD $100,000,000. The Sanjel Group's monthly equipment lease expense is approximately CAD $2,300,000 (assuming an exchange rate of CAD $1.31 to USD $1.00).

*Legal Proceedings*

45.     The Sanjel Group entities are involved in a number of litigation actions, in the ordinary course of business, most of which are not material. Two material current litigation actions are:

(a)     Three class actions commenced in the U.S. alleging breaches of labour laws. The total potential exposure for the one class action that has been thoroughly analyzed

4837-7358-3152.1
113232\000001
04/04/2016 3:58 PM

by the Sanjel Group, if proven, believed not to exceed USD $5,000,000.  The exposure with respect to the other two class actions has not been analyzed; and

(b)     A claim by Preferred Sands of Canada, ULC and Preferred Pipeline, LLC, alleging a multi-year breach of a take-or-pay sand supply contract, in which the amount claimed is USD $29,000,000.

A list of all pending litigation is attached to the Notice as Exhibit V.

## VI.    EVENTS LEADING TO SANJEL GROUP'S CURRENT CIRCUMSTANCES

### A.    Operational and Financing Events

46.     As has been well-publicized, there has been a catastrophic deterioration in the macro commodity price environment for oil and natural gas globally.  Since July 2014, the benchmark West Texas Intermediate ("WTI") crude oil price has dropped from approximately USD $100/bbl to its current price of approximately USD $20/bbl to USD $41/bbl.  Similarly, the benchmark Henry Hub natural gas price has dropped from approximately USD $4.50/MMbtu to its current price range of approximately USD $1.65MMbtu to USD $1.80/MMbtu.  This precipitous price decline has severely curtailed the revenues of North American oil and gas exploration and production companies ("North American E & P Companies"). As a result, over the last 18 months, North American E & P Companies have drastically reduced their capital expenditure budgets and this has resulted in significant pressure on the North American energy services industry, including the Sanjel Group. Among other things, North American E & P Companies are drilling far fewer oil and gas wells (publicly available industry estimates of active rig counts in the U.S. and Canada were approximately 2413 in January 2014 and approximately only 519 in March 2016). In addition, even on drilled wells, North American E & P Companies are simply deferring the completion of many wells until commodity prices recover. These factors have had a direct negative impact on the Sanjel Group's revenue because the amount of work

available from North American E & P Companies has decreased significantly. Furthermore, pricing pressure on the jobs that are still available has increased substantially.

47.     Over the past 18 months, the Sanjel Group has taken aggressive steps to attempt to cut its costs in anticipation of and in reaction to declining revenues. Among other things, the Sanjel Group has taken the following measures:

(a)     reduced staffing levels from approximately 4300 to approximately 2200 employees (2000 North American employees and 208 Saudi Arabian employees);

(b)     instituted across the board salary and benefit reductions;

(c)     consolidated, closed and suspended various locations;

(d)     increased the level of centralization of supply chain procurement and logistics;

(e)     increased operational efficiency by maximizing the utilization of internal assets;

(f)     consolidated management teams;

(g)     reduced all possible discretionary capital expenditures; and

(h)     focused on timely accounts receivable collection and increasing stringency regarding client credit requirements.

The Sanjel Group continues to actively pursue all possible cost reductions.

48.     As a result of the decreasing revenues and profitability earned by the Sanjel Group, certain covenants under the Bank Credit Agreement were breached in late 2015. Since late December of 2015, the Syndicate has been in a position to exercise enforcement rights under the Bank Credit Agreement, including accelerating all amounts outstanding under the Facility.

49.     Additionally, its decreasing revenues led to the Sanjel Group experiencing negative net cash flow and increasing pressure on its working capital situation. As noted above, a semi-annual interest payment of USD $11,250,000 was due and owing on December 19, 2015 under the Bond Agreement. Sanjel Corp had sufficient cash availability to make this interest payment, but it decided not to do so given the extremely constrained working capital situation it

23

was facing at the time and instead entered into the possible restructuring discussions with the

Syndicate and certain holders of the Senior Bonds described below. This non-payment of interest

was a default of the Bond Agreement and a cross-default under the Bank Credit Agreement.  The

Sanjel Group was also in breach of certain covenants under the Bond Agreement.  As noted,

since late 2015, the Sanjel Group has been in negotiations with the Syndicate and an *ad hoc*

committee of holders of the Senior Bonds (whom the Sanjel Group understands to hold over

45% of the Senior Bonds).

50.     Throughout December of 2015 and January and February of 2016, Sanjel Corp

and SUSA negotiated a First Amending Agreement to the Bank Credit Agreement (although this

agreement has the same title as the later in time First Amending Agreement described above, it

was a different agreement and is referred to hereinafter as the "Bank Forbearance Agreement").

The Bank Forbearance Agreement amended certain covenants and imposed additional

obligations on the Sanjel Group and included an agreement with the Syndicate pursuant to

which, among other things, the Syndicate would agree to forbear from exercising any rights or

remedies that they may have against, or from initiating or instituting legal proceedings against,

any of the Sanjel Group, or from realizing on their security granted in connection with the

Facility, until the earlier of April 30, 2016 or the occurrence of an event of default within the

meaning of the Bank Forbearance Agreement.  Even though the parties have never executed the

Bank Forbearance Agreement, the Chapter 15 Debtors have complied with the reporting and

SISP (defined below) milestones set out in the Bank Forbearance Agreement.

51.     Throughout December of 2015 and January and February of 2016, Sanjel Corp,

on its own behalf and on behalf of the other members of the Sanjel Group, negotiated a

forbearance agreement (the "Bond Forbearance Agreement") with two holders of Senior Bonds

holding what the members of the Sanjel Group believe to be more than 45% of the total Senior Bonds, who are represented by Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") as legal counsel and Moelis & Company ("Moelis") as financial advisor (the "Ad Hoc Bondholders").  Pursuant to the Bond Forbearance Agreement, the Ad Hoc Bondholders would, among other things, agree to forbear from exercising any rights or remedies that they may have against, or from initiating or instituting legal proceedings against, any of the Chapter 15 Debtors, until the earlier of June 15, 2016 or the occurrence of an event of default within the meaning of the Bond Forbearance Agreement.

52.     Throughout January and February, Sanjel Corp., on its own behalf and on behalf of SUSA, negotiated forbearances with each of Banc of America, CIT and Wells Group (the "Forbearing Lessors") in respect of certain equipment leases (the "Lease Forbearance Agreements").  An event of default or default had occurred under such equipment leases due to the defaults or events of default under the Credit Agreement and/or the Bond Agreement.  The Lease Forbearance Agreements provide that for so long as the lease payments continued to be paid to the applicable Forbearing Lessor, such lessor forbears from exercising any rights or remedies that they may have against, or from initiating or instituting legal proceedings against, Sanjel Corp. or SUSA, until the earlier of June 15, 2016, or the occurrence of certain events which cause a "Forbearance Termination Date" within the meaning of the Lease Forbearance Agreements.

53.     As is apparent from the Summons (as defined below) and the Enforcement Notice (as defined below) defaults have occurred that would allow for the full amounts outstanding under the Facility and the Bond Agreement (approximately CAD $800,000,000 in the aggregate) to be immediately accelerated and due and owing by all of the members of the Sanjel Group, as

principal obligors and/or guarantors. As a result, since the cross-default under the Bank Credit Agreement resulting from the non-payment of the December 2015 interest payment under the Bond Agreement, the Agent has had the ability, among other things, to immediately exercise set-off rights and sweep all the cash held by Sanjel Corp in its accounts with Syndicate members. As such, the Chapter 15 Debtors have relied on the Syndicate's *de facto* forbearance to be able to continue operating their business.

54.     The liquidity position of the Chapter 15 Debtors has deteriorated significantly since December 2015. As at December 31, 2015, the Chapter 15 Debtors held cash balances in the aggregate amount of approximately CAD $137,000,000. The Chapter 15 Debtors' cash balances have decreased and as of March 31, 2016, the Chapter 15 Debtors held cash balances in the approximate aggregate amount of CAD $58,200,000. This deterioration has resulted from the Chapter 15 Debtors' operating results, the payment of significant restructuring costs and a partial paydown of the debt under the Bank Credit Facility of CAD $45,000,000 (made on February 4, 2016, in anticipation of the parties entering into the Bank Forbearance Agreement) and a further paydown of CAD $18,000,000, which was a pre-condition under the Interim Credit Agreement (as defined below).

55.     As of February 17, 2016, the Syndicate, the Chapter 15 Debtors and the Ad Hoc Bondholders had agreed upon the forms of the Bank Forbearance Agreement. The conditions precedent to the implementation of the Bank Forbearance Agreement and the Bond Forbearance Agreement included, among other things:

(a)     the Borrowers under the Bank Credit Agreement paying down the aggregate principal amount owing to the Syndicate by an amount not less than CAD $100,000,000;

(b)     holders of not less than 2/3 of the Senior Bonds having executed the Bond Forbearance Agreement;

26

(c)     the Chapter 15 Debtors having paid certain fees to ATB as Agent under the Bank Credit Agreement, and having paid certain fees to the legal and financial advisors of the Ad Hoc Bondholders; and

(d)     Sanjel Corp. having paid to the Trustee of the Senior Bonds, the sum of USD $11,250,000.

56.     As of February 25, 2016, these conditions precedent had not been satisfied. Among other things, holders of 2/3 of the Senior Notes had not signed the Bond Forbearance Agreement.

57.     On February 25, 2016, the Trustee, delivered to Sanjel Corp. a copy of a summons (the "Summons") for a meeting of the holders of the Senior Notes (collectively, the "Bondholders") in Oslo, Norway on March 10, 2016 ("March 10 Meeting").  The Summons set out for consideration by the meeting of two mutually exclusive alternative resolutions:

(a)     a "Remedies Option", being a direction that the trustee accelerate all amounts outstanding under the Bond Agreement and commence enforcement steps, including (i) a petition under the U.S. Bankruptcy Code; (ii) an order barring "any further payments to the Issuer's equity holders, the MacDonald family or MacBain … in connection with the Issuer's manifold leases with MacBain"; and (iii) disgorgement of any and all non-market lease payments made by the Issuer to MacBain or to the MacDonald family", in each case as the trustee determines appropriate.  The approval threshold was stated to be 50% of the voting Bondholders; or

(b)     a "Forbearance Option", being approval of the Bond Forbearance Agreement, subject to revisions that would (i) make the trustee the counterparty; and (ii) appoint Moelis and Fried Frank as advisors to the trustee, for Sanjel Corp.'s account.  This option was premised on payment of the December interest amount. The approval threshold was stated to be two-thirds of the voting Bondholders.

58.     Attached as Exhibit N to the Notice is a true copy of the Summons.

59.     The Summons, and the prospect of the March 10 Meeting at which the Bondholders might vote to accelerate the amounts outstanding under the Bond Agreement and take enforcement steps presented a great deal of unpredictability and potential prejudice to the Chapter 15 Debtors, their business and the going concern value of the business.  Accordingly, the

Chapter 15 Debtors' legal advisors held a number of calls with representatives of the Trustee and representatives of the Ad Hoc Bondholders in the week leading up to the proposed meeting on March 10, 2016, to attempt to achieve a postponement or adjournment of the March 10 Meeting.

### B.     Sales and Investment Solicitation Process ("<u>SISP</u>")

60.     In the Fall of 2015, Sanjel Corp had engaged Bank of America Merrill Lynch ("<u>BAML</u>") to identify strategic partners and raise additional capital for the Sanjel Group.  28 private equity firms were contacted, of which 19 executed non-disclosure agreements and to whom 9 management presentations were made (the "<u>BAML Process</u>").  Despite considerable interest, the BAML Process did not result in a successful transaction, given the high leverage of the Sanjel Group and the capital structure.

61.     While the BAML Process did not result in a transaction, it identified the group of bidders in the Sanjel Group's markets most likely to have an interest in the Sanjel Group and their assets, and most likely to be able to finance and close a transaction.  Because many of those bidders who engaged in the BAML Process had conducted recent extensive due diligence, the Financial Advisors had a substantial "head start" in implementing the SISP.

62.     In addition to the BAML Process, the Chapter 15 Debtors have been pursuing other initiatives.  On September 22, 2015, Sanjel Corp. entered into an engagement letter entered into between Wells Fargo Securities Canada, Ltd. ("<u>Wells Fargo Securities</u>") with respect to the marketing of the Suretech and Terracor parts of the business.

63.     On September 28, 2015, Sanjel Corp. entered into an engagement letter with Credit Suisse Securities (CANADA), Inc. ("<u>CS</u>"), pursuant to which CS pursued mandates to identify either new debt financing for the Sanjel Group, or the amendment of the Sanjel Group's existing financial debt obligations.  The first engagement letter was subsequently replaced with a

second engagement letter dated February 16, 2016 with respect to the solicitation of purchase, investment, recapitalization and restructuring proposals respecting the Chapter 15 Debtors or substantially all or a portion of their assets.

64.     As a result of the Sanjel Group's continued deterioration of the Sanjel Group's business and the breaching of covenants described above, on December 21, 2015, Sanjel Corp. entered into an engagement letter with PJT Partners LP ("PJT") with respect to the solicitation of purchase, investment, recapitalization and restructuring proposals respecting the Chapter 15 Debtors or substantially all or a portion of their assets. Collectively, CS, PJT, and Wells Fargo Securities are hereinafter referred to as the "Financial Advisors").

65.     Wells Fargo Securities has been pursuing its mandate since September of 2015. On or about January 17, 2016, CS and PJT on behalf of the Sanjel Group commenced a SISP to solicit purchase, investment, recapitalization and restructuring proposals respecting the Chapter 15 Debtors or substantially all or a portion of their assets. The Syndicate required commencement of the SISP as a condition of continuing to forbear from enforcement of the Syndicate's rights and remedies, based on the existing defaults under the Bank Credit Agreement and the Chapter 15 Debtors agreed that a SISP was necessary and appropriate under the circumstances.

66.     The SISP has been implemented as follows:

(a)     On or about January 17, 2016 – commenced contacting bidders, including those who had taken part in the BAML Process;

(b)     January 26, 2016 – updated and opened the Virtual Data Room ("VDR") (which has been continuously updated and further populated since that date, to facilitate bidders' due diligence);

(c)     January 26, 2016 – commenced distributing a Teaser Letter (attached to the Notice as Exhibit R) to bidders;

(d)    January 26, 2016 – commenced face-to-face meetings with bidders, including with the Management Team where requested by a bidder or where appropriate (which has continued to date);

(e)    January 27, 2016 – commenced executing non-disclosure agreements with bidders who had not signed NDAs in the BAML Process;

(f)    January 28, 2016 – commenced distributing a Process Letter to bidders;

(g)    February 22, 2016 – Preliminary, Non-Binding Indications of Interest due; and

(h)    March 9, 2016 – binding offers were due.

67.    The Syndicate did not participate in the SISP as a bidder, either through a credit bid or otherwise.

68.    Throughout the course of the SISP, the Chapter 15 Debtors and their legal and financial advisors have kept the Syndicate and its legal and financial advisors updated on the progress of the SISP on a regular weekly basis, or more frequently when the circumstances warranted it.

69.    In the SISP, a total of 85 parties were contacted, (65 financial sponsors with or without existing investments in pressure pumping portfolio companies and 20 strategic buyers). Of the 85 parties who actively engaged in the SISP:

(a)    37 executed NDAs;

(b)    25 conducted due diligence in the VDR or otherwise;

(c)    17 met with the Management Team; and

(d)    8 submitted non-binding indications of interest for all or a part of the Sanjel Group's business by the February 22, 2016 phase 1 deadline (2 strategic parties and 6 financial parties), with one additional strategic party, submitting a non-binding indication of interest three days later.

70.    Thereafter, the Chapter 15 Debtors, in consultation with the Financial Advisors and their legal advisors, identified the top five bidders based on Phase 1 indications of interest (two strategic parties and three financial parties).  The Chapter 15 Debtors and the Financial

Advisors advised those parties that they were required to submit binding offers, including marked-up asset purchase agreements, by March 9, 2016 (the "Second Round Bids").

71. Five parties submitted Second Round Bids. The Chapter 15 Debtors reviewed the Second Round Bids and, in consultation with the Financial Advisors and their legal advisors, determined that it was in the best interests of the Chapter 15 Debtors and all their stakeholders to continue negotiations with the top three bidders, with the goal of finalizing all outstanding due diligence and being in a position to execute a final and binding asset purchase agreements on March 24, 2016. The Financial Advisors and the Chapter 15 Debtors' legal advisors communicated this process and deadline to the top three bidders on March 11, 2016.

72. On or about April 3, 2016, the Chapter 15 Debtors entered into two Asset Purchase Agreements ("APAs") for the sale of substantially all of the assets comprising the Sanjel Group's Canadian and U.S. businesses:

(a)     An APA with Step Energy Services Ltd. For the sale of substantially all of the assets comprising the Sanjel Group's Canadian business; and

(b)     An APA with Liberty Oilfield Services Holdings LLC for the sale of substantially all of the assets comprising the Sanjel Group's U.S. business (excluding the Suretech and Terracor businesses).

73. As noted above, the Financial Advisors, in conjunction with the Chapter 15 Debtors, conducted a thorough and comprehensive canvassing of the relevant market for the Chapter 15 Debtors and their assets.

C.     **Solicitation of a Restructuring Offer from the Senior Notes**

74. Since early 2016, the Ad Hoc Bondholders have on many occasions advised the Chapter 15 Debtors that they were interested in submitting a bid for a restructuring proposal for the Chapter 15 Debtors. Both before the SISP and then concurrently with the SISP, the Chapter 15 Debtors have actively engaged with the Ad Hoc Bondholders to solicit and discuss a possible

restructuring transaction.  Along with regular contact between the Chapter 15 Debtors and the Ad Hoc Bondholders, and regular contact between the Chapter 15 Debtors' Canadian legal counsel, Fried Frank and Moelis, the following specific things have occurred in this regard:

(a)     Fried Frank and Moelis executed non-disclosure agreements with the Chapter 15 Debtors in late December 2015;

(b)     commencing on the weekend of January 9 and 10, 2016, Moelis and Fried Frank were granted access to a VDR and Moelis and Fried Frank began accessing the Chapter 15 Debtors' material non-public information in the VDR at that time;

(c)     January 20, 2016 - the Management Team was present in New York City for meetings with other bidders and offered to meet with the Ad Hoc Bondholders (which meeting was not accepted);

(d)     January 29, 2016 - the Ad Hoc Bondholders  advised the Chapter 15 Debtors that they were prepared to restrict themselves from trading in securities of the Chapter 15 Debtors to facilitate their receipt of material, non-public information regarding the Chapter 15 Debtors;

(e)     February 2, 2016 - the Ad Hoc Bondholders executed NDA's to allow them to conduct due diligence;

(f)     February 2, 2016 - the Ad Hoc Bondholders provided to the Chapter 15 Debtors and to the Syndicate a restructuring term sheet;

(g)     February 8, 2016 - the Chapter 15 Debtor's Management Team and representatives of the Syndicate travelled to New York City to meet with the Ad Hoc Bondholders and their respective advisors;

(h)     February 12, 2016 - the Chapter 15 Debtors delivered to the Ad Hoc Bondholders an indicative restructuring term sheet;

(i)     commencing on February 15, 2016 - the Chapter 15 Debtors accommodated the Ad Hoc Bondholders' request to have Alvarez & Marsal, Inc., another of their financial advisors, visit the Calgary Head Office and conduct additional due diligence on their behalf;

(j)     March 2, 2016 - the Ad Hoc Bondholders delivered another restructuring term sheet to the Chapter 15 Debtors and the Syndicate.  This term sheet was expressly delivered on a confidential and privileged basis and as such, the Chapter 15 Debtors cannot disclose it in evidence in these proceedings;

(k)     as part of the arrangement reached between the parties to postpone the March 10, 2016 meeting of the Bondholders, the Ad Hoc Bondholders requested that the

32

Syndicate provide a written response to the March 2, 2016 term sheet, on or before March 11, 2016;

(l)     March 11, 2016 - representatives of the Syndicate provided to the Ad Hoc Bondholders and the Chapter 15 Debtors a counter-proposal restructuring term sheet. This counter-proposal restructuring term sheet was expressly delivered on a confidential and privileged basis and as such, the Chapter 15 Debtors cannot disclose it in evidence in these proceedings; and

(m)     March 20, 2016 - representatives of the Ad Hoc Bondholders provided to the Chapter 15 Debtors and the Syndicate a further restructuring term sheet. This restructuring term sheet was expressly delivered on a confidential and privileged basis and as such, the Chapter 15 Debtors cannot disclose it in evidence in these proceedings; and

(n)     March 31, 2016 - upon information and belief, representatives of the Syndicate and the Ad Hoc Bondholders held a teleconference to further discuss certain aspects of the potential restructuring.

75.     On or about March 7, 2016, the Chapter 15 Debtors, the Ad Hoc Bondholders and the Trustee reached an agreement to allow for the postponement of the March 10 Meeting. The terms and conditions of that agreement were as follows:

(a)     the Chapter 15 Debtors agreed to pay USD $100,000 to the Trustee to allow the Trustee to obtain and fund its own independent legal counsel;

(b)     the Chapter 15 Debtors agreed (while reserving all their rights as to any Chapter 11 proceeding or the appointment of any Chief Restructuring Officer) to grant access to their material non-public information to Mr. Peter Gibson, a representative of Alvarez & Marsal Canada ULC, upon the execution by an appropriate non-disclosure agreement;

(c)     the Chapter 15 Debtors agreed to pay the accrued fees to date of Fried Frank (which were reported to be USD $675,000) and to provide a USD $300,000 retainer amount for future fees of Fried Frank;

(d)     the Chapter 15 Debtors agreed to pay the accrued fees of Alvarez & Marsal, Inc. (which were reported to be USD $345,729.17) and to provide a USD $250,000 retainer amount for future fees of Alvarez & Marsal, Inc.;

(e)     the Chapter 15 Debtors agreed to pay the accrued fees of Moelis (which were reported to be USD $390,527.67) and to provide a USD $100,000 retainer amount for future fees of Moelis;

33

(f)     the Ad Hoc Bondholders agreed to withdraw their written request for the March 10 Meeting and to ask the Trustee to postpone that meeting to March 31, 2016; and

(g)     the Chapter 15 Debtors, the Trustee and the Ad Hoc Bondholders agreed that an information update teleconference would be held on March 11, 2016 at which the parties would provide an update to any Bondholder that wished to call in and participate.

76.     The Chapter 15 Debtors paid the amounts to the Trustee and the various advisors to the Ad Hoc Bondholders as described in the paragraph above, on or before March 10, 2016. The Trustee postponed the March 10 Meeting to March 31, 2016 by way of a notice posted to the Bondholder website.  The Trustee subsequently postponed the March 31 meeting until April 14, 2016 by way of a notice to the Bondholder website.

77.     On or about March 8, 2016, the Trustee retained Albert Togut of Togut, Segal & Segal LLP in New York City, as the Trustee's independent counsel.  On March 11, 2016, representatives of the Chapter 15 Debtors and their legal advisors and Financial Advisors, participated in the teleconference call to provide an information update to all Bondholders.  Also on the call were the Trustee, Mr. Togut, representatives of Fried Frank, Moelis, several Bondholders and at least one of the two Ad Hoc Bondholders.

**D.      Enforcement by the Syndicate**

78.     On March 18, 2016, legal counsel for the Syndicate delivered to the Applicants demands for repayment of all amounts outstanding under the Bank Credit Agreement, along with 10-day Notices of Intention to Enforce Security pursuant to section 244 of the *Bankruptcy and Insolvency Act* (the "Enforcement Notice").  Attached as Exhibit Q to the Notice is a true copy of the Enforcement Notice.

34

E.      **MacBain Lease Payments**

79.     On March 25, 2016, at the request of the Syndicate, legal counsel for the Chapter 15 Debtors requested that MacBain agree to a deferral of rent payments owed to MacBain by two weeks.  On March 27, 2016, legal counsel for MacBain advised that MacBain would not agree to this request.

## VII.   THE CANADIAN PROCEEDINGS

80.     The CCAA is a Canadian federal act[2] that affords financially troubled corporations the opportunity to restructure their financial affairs through a debtor-in-possession, court supervised process. Corporations seeking relief under the CCAA are given the opportunity to avoid liquidation, typically allowing such corporations' creditors to receive some form of distribution for outstanding amounts owing to them while preserving the going-concern value of the corporation. The process is commenced by applying to the Canadian court for protection under the CCAA. The Canadian court will then issue an initial order, giving the debtor thirty (30) days of protection, or a stay of proceedings from its creditors to allow for the preparation of a Plan of Arrangement. The debtor has the ability to make subsequent applications to the Canadian court to extend the stay of proceedings to allow it more time to complete a Plan of Arrangement where necessary.

81.     The initial order will also appoint an independent Court officer known as a "monitor".  The monitor must be a licensed trustee within the meaning of section 2(1) of the *Bankruptcy and Insolvency Act* (Canada) and is an independent third party appointed by the court to monitor the company's ongoing operations, reporting regularly to the court and creditors, and

---

[2] The Court in *In re Fracmaster, Ltd.*, 237 B.R. 627, n. 3 (Bankr. E.D. Tex. 1999) noted that "[t]he CCAA is a Canadian federal statute which provides a statutory system, roughly equivalent to the Chapter 11 process in the United States, whereby corporations which are insolvent may seek court protection from creditor actions as they attempt to restructure their financial affairs, usually by way of a plan of arrangement or compromise with creditors."

assisting with the filing and voting on the Plan of Arrangement and other matters related to the CCAA proceedings.  The monitor's duties also include reporting to the Court on any major events that may impact the viability of the company and notifying creditors and shareholders of any meetings relating to the CCAA proceedings.  The Court can "enhance" a monitor's powers to give the Monitor the authority to take on other responsibilities of the debtors where appropriate.

82.     On April 4, 2016, the Chapter 15 Debtors instituted the Canadian Proceedings by filing applications for the commencement of reorganization proceedings pursuant to the CCAA in the Canadian Court.  On April 4, 2016, the Canadian Court granted an initial order (the "Initial Order") for relief in the Canadian Proceedings, a certified copy of which is attached as Exhibit A to the Notice.

83.     Pursuant to the Initial Order, a stay is in place in Canada which prohibits any proceeding or enforcement process against the Chapter 15 Debtors or their assets.  Initial Order at ¶ 14.  Further, all rights and remedies of any entity, whether judicial or extra-judicial, are stayed and suspended against the Chapter 15 Debtors and their assets.  *Id.* at ¶ 15.

84.     Also, on April 4, 2016, the Canadian Court appointed PwC as the "Monitor" of the Canadian Proceedings under the Initial Order.  Initial Order at ¶ 30.  In addition to the normal powers and duties of the Monitor under the CCAA, the Canadian Court granted the following enhanced powers to the Monitor to be exercised in its discretion, as and when it deems appropriate, on one day written notice to the Syndicate and the Chapter 15 Debtors:

(a)     Exercise broad restructuring powers as set forth in paragraph 11(d) of the Initial Order;

(b)     to disclaim or resiliate agreements to which the Chapter 15 Debtors are parties, pursuant to s. 32 of the CCAA;

(c)     to continue, implement, conduct and complete the SISP, including without limitation taking all ancillary and necessary steps in relation to the SISP such as evaluating offers, negotiating and executing agreements on behalf of the Chapter 15 Debtors and applying for court orders related to the SISP;

(d)     take all steps and execute such necessary documents, certificates and agreements, on behalf of any Chapter 15 Debtor, in respect of or reasonably incidental to the banking, financial or administrative activities of such Chapter 15 Debtor; and

(e)     to perform such other duties or take any steps reasonably incidental to the exercise of any powers and obligations conferred upon the Monitor by the Initial Order, or any further order of the Court.  *Id.* at ¶ 38.

The Monitor's role in the Canadian Proceedings is to monitor the debtors' property and business affairs, and the Chapter 15 Debtors are obligated to cooperate with the Monitor in this respect. *Id.* at ¶ 30. The Canadian Court also appointed the Monitor as the foreign representative of the Chapter 15 Debtors.  *Id.* at ¶ 64.

85.     As noted above, parties related to or affiliated with the MacDonald Family own the Sanjel Group, directly and indirectly, and also own MacBain and the US MacBain Companies, directly or indirectly.  As such, the CEO of Sanjel Corp, Darin MacDonald, is in a potential conflict of interest because the interests of the Sanjel Group, MacBain and the US MacBain Companies may become adverse during these proposed restructuring proceedings. Additional potential conflicts of interest could also arise, depending on the outcome of the SISP and the interests or intentions of transaction proponents and bidders in the SISP.

86.     As a result, the Chapter 15 Debtors, in consultation with their advisors and the Monitor, have determined that it is in the best interest of the Chapter 15 Debtors to prevent such a conflict of interest from arising by enhancing the powers of the Monitor to grant the Monitor the authority to issue disclaimers and resiliations under s. 32 of the CCAA and also to exercise authority over the SISP.  The Initial Order provides that the Monitor will have the authority to

exercise these powers in its discretion, as and when the Monitor deems it appropriate or necessary.

87.     Additionally, in order to further minimize any potential conflicts, Paul Crilly has been appointed Chief Restructuring Officer for the Chapter 15 Debtors and Darin McDonald has tendered his resignations as a director of all of the Chapter 15 Debtors.

88.     Additionally, pursuant to the Initial Order, the Canadian Court approved the following payments and changes as being necessary and appropriate to the Chapter 15 Debtors' ability to continue as a going concern and to prosecute the CCAA Proceedings and the Chapter 15 cases:

(a)     Payments to Critical Suppliers and Critical Suppliers' Charge:  Authorized the Chapter 15 Debtors to make payments (with such payments to be made in consultation with and approval by the Monitor) to a small number of Critical Suppliers for goods and services after, the commencement of the CCAA Proceedings and the Chapter 15 Cases up to a maximum amount of CAD $20,000,000, an amount usually paid to the Critical Suppliers in a typical month and authorizing a Critical Supplier's Charge inferior only to the Administration Charge, the Credit Card Charge, the Interim Financing Charge, the Directors' Charge, the KERP Charge and the Financial Advisor's Charge;

(b)     Payments to Employees:  Authorized the Chapter 15 Debtors to pay salaries and wages to employees arising prior to the commencement of the CCAA Proceedings and the Chapter 15 Cases;

(c)     Credit Card Charge:  Authorized the Chapter 15 Debtors to pay all pre-filing amounts outstanding under corporate credit cards in place with The Bank of Nova Scotia and authorized a charge in favor of The Bank of Nova Scotia relating to such pre-filing and post-filing credit card payments in the maximum amount of CAD $250,000, inferior only to the Administration Charge, and the Interim Financing Charge.

(d)     Administration Charge:  Authorized a priority charge on the assets of the Chapter 15 Debtors in a maximum amount of CAD $2,000,000 in respect of fees and disbursements of the (i) Monitor/Foreign Representative, (ii) Monitor/Foreign Representative's counsel in Canada and the United States, (iii) the Chapter 15 Debtors' counsel in Canada, the United States, Norway and elsewhere, (iv) Syndicate's counsel incurred in connection with the CCAA Proceedings and

38

the Chapter 15 Cases, (v) Syndicate's Advisor and (vi) compensation to be paid to Paul Crilly in his role as chief restructuring officer;

(e) <u>Directors' Charge</u>: Authorized a priority charge, inferior only to the Administration Charge, the Interim Financing Charge and the Credit Card Charge in a maximum amount of up to CAD $5,000,000 to cover (i) the Chapter 15 Debtors' Officers and Directors for liabilities, if any, incurred during the course of the CCAA Proceedings and the Chapter 15 Cases in their role as officers and/or directors not otherwise covered by directors' and officers' liability insurance policies, and (ii) indemnity obligations owed to Paul Crilly in his role as chief restructuring officer;

(f) <u>KERP and KERP Charge</u>: Authorized a key employee retention program and a charge in an amount not to exceed CAD $2,800,000 to incentivize the retention of key employees to remain in their employment during the course of the CCAA Proceeding and the Chapter 15 Cases. Without the retention of key employees, the Chapter 15 Debtors' ability to successfully maintain their business operations and preserve asset value while they restructure would be seriously compromised. The KERP Charge is inferior only to the Administration Charge, the Interim Financing Charge, the Credit Card Charge and the Directors' Charge;

(g) <u>Interim Financing and Interim Financing Charge</u>[3]: Approved a post-petition loan from the Syndicate to the Chapter 15 Debtors and the granting of security for such loan (the "<u>Interim Financing</u>") pursuant to a Senior Secured Superpriority Credit Agreement (the "<u>Interim Credit Agreement</u>"), including a charge (the "<u>Interim Financing Charge</u>") to the maximum amount of CAD $50,000,000, inferior only to the Administration Charge; and

(h) <u>Financial Advisors' Charge</u>: Approved a priority charge up to the maximum amount of USD $6,600,000 for Financial Advisors, inferior only to the Administration Charge, the Interim Financing Charge, the Credit Card Charge, the Directors' Charge and the KERP Charge.

89. All of the payments and charges approved by the Canadian Court in the Initial Order, including those discussed above, were approved by the Canadian Court as necessary and appropriate and were not objected to by the Syndicate.

---

[3] Concurrently with the filing of this Petition, the Foreign Representative and the Chapter 15 Debtors have filed that certain "Motion for an Order (I) Specifically Recognizing Canadian Court Order Authorizing Debtors to Borrow Under a Post-Petition Credit Facility, (II) Approving Liens On Assets Located in the Territorial Jurisdiction of the United States and (III) Granting Adequate Protection to Prepetition Secured Parties seeking approval of this Court of the Interim Financing approved by the Canadian Court in the Initial Order (the "Post-Petition Financing Motion"). Issues related to the Interim Financing and Interim Financing Charge will be addressed in the Court's rulings on the Post-Petition Financing Motion.

90.     Pursuant to the Initial Order, the Canadian Court "requests the aid and recognition of any court . . . in the United States . . . to give effect to this Order and to assist [the Chapter 15 Debtors], the Monitor and their respective agents in carrying out the terms of this Order." Initial Order at ¶ 62. The Initial Order also allows for "[e]ach of [the Chapter 15 Debtors] and the Monitor be at liberty and is hereby authorized and empowered to apply to any court . . . , wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order." *Id*. at ¶ 63.

## VIII.    SANJEL GROUP'S INTENDED ACTIONS FOR REORGANIZATION

91.     The Chapter 15 Debtors believe the ability to carry on their operations will add value in restructuring and/or selling the business as a going concern. Although this process is not yet complete, the Chapter 15 Debtors expect over the coming weeks to pursue a going concern sale of their assets or a recapitalization or restructure of their business (or a combination thereof).

## IX.    THE CHAPTER 15 CASES

92.     Substantially contemporaneous with the filing of this Petition for Recognition, Sanjel Corp. filed Official Form No. 1 Chapter 15 petitions for each of the Chapter 15 Debtors pursuant to 11 U.S.C. § 1504, 1509(a) and 1515(a). Pursuant to the Initial Order, the Monitor is a foreign representative in a foreign proceeding, and hereby seeks relief under Chapter 15 of the Bankruptcy Code.

## **RELIEF REQUESTED**

93.     The Monitor hereby respectfully requests that this Court enter an order pursuant to Sections 105, 1507, 1517, 1520 and 1521 of the Bankruptcy Code, substantially in the form of

the proposed order attached hereto (the "<u>Proposed Order</u>"), a copy of which is attached hereto as Exhibit A providing the following relief:

- Recognition of the Canadian Proceedings as a foreign main proceeding as defined in Section 1502(4) of the Bankruptcy Code;

- Granting to the Monitor, as the foreign representative of the Chapter 15 Debtors and the Chapter 15 Debtors the relief afforded under Section 1520 of the Bankruptcy Code as is provided by right upon the recognition of the Canadian Proceedings as a foreign main proceeding, with the specification that the Chapter 15 Debtors will continue to operate their business pursuant to Section 1520(a)(3);

- Granting further additional relief as authorized by Section 1521 of the Bankruptcy Code including, without limitation:

  o Staying the commencement or continuation of any action or proceeding concerning the assets, rights, obligations or liabilities of the Chapter 15 Debtors, including any action or proceeding against PwC in its capacity as Monitor and foreign representative of the Chapter 15 Debtors, to the extent not stayed under Section 1520(a) of the Bankruptcy Code;

  o Staying execution against the assets of the Chapter 15 Debtors to the extent not stayed under Section 1520(a) of the Bankruptcy Code;

  o Suspending the right to transfer or otherwise dispose of any assets of the Chapter 15 Debtors located in the United States to the extent not suspended under Section 1520(a) of the Bankruptcy Code by any person or entity other than the Monitor and the Chapter 15 Debtors unless

4837-7358-3152.1
113232\000001
04/04/2016 3:58 PM

authorized in writing by the Monitor and the Chapter 15 Debtors or by Order of this Court;

o    Providing for the examination of witnesses, the taking of evidence, the production of documents, or the delivery of information concerning the assets, affairs, rights, obligations or liabilities of the Chapter 15 Debtors, and finding that such information is required in the Canadian Proceedings under the law of the United States; and

o    Entrusting the administration or realization of all or part of the assets of the Chapter 15 Debtors within the territorial jurisdiction of the United States to the Chapter 15 Debtors;

•    Except for the provisions relating to the Interim Financing and the Interim Financing Charge[4], otherwise granting comity to and giving full force and effect to the Canadian Court, the Canadian Proceedings and the Initial Order; and

•    Awarding the Monitor, as the foreign representative, and the Chapter 15 Debtors such other and further relief as this Court deems just and appropriate.

94.    The Monitor respectfully submits that the Canadian Proceedings should be recognized as a foreign main proceeding as defined in Section 1502(4) of the Bankruptcy Code. If, however, the Court determines the Canadian Proceedings are not foreign main proceedings (either in whole or in part), the Monitor seeks recognition of the Canadian Proceedings as a foreign nonmain proceeding, as defined in Section 1502(5) of the Bankruptcy Code, and requests that the Court grant the relief requested above under the Court's discretion pursuant to Section 1521 of the Bankruptcy Code.

---

[4] As noted in Footnote 2, issues related to the Interim Financing and Interim Financing Charge will be addressed in the Court's rulings on the Post-Petition Financing Motion.

<u>**BASIS FOR RELIEF REQUESTED**</u>

## I. STATUTORY AUTHORITY

95.     A Chapter 15 case is commenced when a foreign representative files a petition for recognition of a foreign proceeding under 11 U.S.C. § 1515; *In re Oversight & Control Comm'n of Avanzit, S.A.,* 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008). The petition must be accompanied by certain documentary evidence, which the court may presume to be authentic. 11 U.S.C. § 1516(b). The Court must grant the request for recognition if it finds:

(1)     such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;

(2)     the foreign representative applying for recognition is a person or body; and

(3)     the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a).

96.     A decision or certificate from a foreign court indicating the foreign proceeding is a "foreign proceeding," as defined in section 101(23) of the Bankruptcy Code, is presumptively correct. 11 U.S.C. § 1516(a). Similarly, a decision or certificate from a foreign court indicating that the Monitor is a "foreign representative," as defined in section 101(24), is presumptively correct. *Id.*

97.     As stated above, (a) the Canadian Proceedings are foreign proceedings under the definition of 11 U.S.C. § 101(23), (b) the Monitor is a foreign representative under the definition of 11 U.S.C. § 101(24) and is a "person" under the definition of 11 U.S.C. § 101(41), and (c) the petition meets the requirements of Section 1515, namely, the evidence of (i) the foreign proceedings and (ii) that the Monitor has been appointed as the foreign representative has been

43

provided.[5]  See Initial Order at ¶ 64.  Accordingly, the requirements for recognition of the Canadian Proceedings as foreign proceedings are met.

## II.  RULE REQUIREMENTS FOR RECOGNITION OF THE CANADIAN PROCEEDINGS

98.  A petition for recognition of a foreign proceeding under chapter 15 of the Code shall state the country where the debtor has its center of main interests. Fed. R. Bankr. P. 1004.2(a). The center of main interests for each of the Chapter 15 Debtors is Alberta, Canada. This has been provided in the Chapter 15 Debtors' Official Form 1 Petitions.

99.  The petition for recognition shall also identify each country in which a foreign proceeding by, regarding, or against the debtor is pending. Fed. R. Bankr. P. 1004.2(a). The Chapter 15 Debtors are debtors in the foreign proceedings described in the Initial Order. This information has also been provided in the Chapter 15 Debtors' Official Form 1 Petitions.

100.  A foreign representative filing a petition for recognition under chapter 15 shall file with the petition a corporate ownership statement containing the information described in Rule 7007.1. Fed. R. Bankr. P. 1007(a)(4). Such a corporate ownership statement has been filed contemporaneously herewith.

101.  A foreign representative filing a petition for recognition under chapter 15 shall file with the petition (unless the court orders otherwise), a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is being sought under §1519 of the Code. Fed. R. Bankr. P. 1007(a)(4). A Rule 1007(a)(4) List has been filed contemporaneously herewith.

---

[5] The term "person" includes individual, partnership, and corporation. 11 U.S.C. § 101(41).

4837-7358-3152.1
113232\000001
04/04/2016 3:58 PM

### III.    REQUIREMENTS FOR A PETITION FOR RECOGNITION

102.    A petition for recognition shall be accompanied by any one of the following:

(1)    a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

(2)    a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

(3)    in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

11 U.S.C. § 1515(b).

Accordingly, in compliance with 11 U.S.C. § 1515(b), attached to the Notice as Exhibit A is a certified copy of the Initial Order from the Canadian Proceedings, which may be presumed authentic. 11 U.S.C. § 1516(b).

### IV.    THE CANADIAN PROCEEDINGS ARE PENDING "<u>FOREIGN PROCEEDINGS</u>"

103.    "<u>Foreign proceeding</u>" is defined in the Bankruptcy Code as "a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23).

104.    The Canadian Proceedings fall squarely within the definition of "foreign proceeding." Prior to the passage of Chapter 15, United States courts recognized cases filed under the CCAA to be "relating to insolvency." See *Tradewell, Inc. v. American Sensors Electronics Inc.*, 1997 WL 423075 n. 1 (S.D.N.Y. 1997) (noting that the "CCAA is a broad statute, the purpose of which is to 'provide insolvent debtors with the opportunity to restructure their financial affairs with their creditors.'"). Moreover, since the passage of Chapter 15, cases

4837-7358-3152.1
113232\000001
04/04/2016 3:58 PM

filed under the CCAA have consistently been recognized as "foreign proceedings." *See, e.g., In re Nortel Networks, Inc.*, 469 B.R. 478, 487 (Bankr. D. Del. 2012) (the Court entered an Order recognizing the proceeding under the CCAA was a foreign main proceeding under chapter 15 of the Bankruptcy Code); *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685, 688 (Bankr. S.D.N.Y. 2010) ("It is clear that the Canadian Proceedings should be recognized as a foreign main proceeding."); *In re Gandi Innovations Holdings, LLC*, 09-51782-C, 2009 WL 2916908 (Bankr. W.D. Tex. June 5, 2009) (Unpublished disposition) (the "CCAA Proceeding is a foreign proceeding entitled to recognition under Chapter 15 of the Code."); *In re Quebecor World Inc.*, Case No. 08-13814 (Bankr. S.D.N.Y. 2008).

## V.  THE MONITOR IS A "<u>FOREIGN REPRESENTATIVE</u>"

105.    Section 101(24) of the Bankruptcy Code defines "foreign representative" as "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding."

106.    The Monitor may serve as the "foreign representative" because it constitutes a "person or body." "Person" is defined under Section 101(41) of the Bankruptcy Code to include an individual, partnership or corporation.  Because the Monitor is an incorporated entity, it therefore qualifies as a "person" and can accordingly serve as a "foreign representative." Additionally, the Monitor has been authorized in the Canadian Proceedings to act as the Chapter 15 Debtors' foreign representative. Initial Order at ¶ 64.  The Initial Order also provides that "[e]ach of the [Chapter 15 Debtors] and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, . . . . ., wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order" Initial Order at ¶ 63.  The Court is

4837-7358-3152.1
113232\000001
04/04/2016 3:58 PM

therefore entitled to presume that the Monitor is a proper "foreign representative." *See* 11 U.S.C. § 1516(b).

## VI. THE CANADIAN PROCEEDINGS SHOULD BE RECOGNIZED AS FOREIGN MAIN PROCEEDINGS BECAUSE CANADA IS THE LOCATION OF THE DEBTOR'S CENTER OF MAIN INTERESTS

107.    A foreign proceeding shall be recognized as a "foreign main proceeding" if it is pending in the country where the debtor has the center of its main interests. 11 U.S.C. § 1517(b). The term "center of main interests" ("COMI") is not defined in the Bankruptcy Code. COMI, however, has been equated with a debtor's principal place of business. *See Bear Stearns*, 374 B.R. at 129 (citing *In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 633-34 (E.D. Calif. 2006)).

### A.    The COMI of the Debtors is Located In Canada Based Upon the Established COMI Factors

108.    The Fifth Circuit has identified five non-exhaustive factors in determining a debtor's COMI: (1) the location of those who actually manage the debtor (which could be the headquarters of a holding company); (2) the location of the debtor's headquarters; (3) the location of the debtor's primary assets; (4) the location of the majority of the debtor's creditors or the majority of creditors affected by the case; and (5) the jurisdiction whose law would apply to most disputes. See *Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1023 (5th Cir. 2010) (citing *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006) aff'd, 371 B.R. 10 (S.D.N.Y. 2007)).

109.    The first and most important factor is the location of those who manage the debtor. In determining COMI under Chapter 15, bankruptcy courts, including those within the Western District of Texas have also utilized the "principal place of business" or "nerve center" test established in *Hertz Corp. v. Friend*, 559 U.S. 77 (2010), which overlaps with this first factor. See *In re Think3 Inc.*, 2011 Bankr. LEXIS 5349, 17-18 (Bankr. W.D. Tex. Sept. 12,

2011), citing and quoting *Hertz Corp.*, 559 U.S. 77 (2010) ("[C]ourts have often equated a corporate debtor's COMI with the debtor's 'principal place of business' . . . Recently, the U.S. Supreme Court held that a corporation's 'principal place of business' is the place where a corporation's officers direct, control, and coordinate the corporation's activities, otherwise known as its 'nerve center.'"); *In re Gandi Innovations Holdings, LLC*, 2009 Bankr. LEXIS 2751, 4-5 (Bankr. W.D. Tex. June 5, 2009) ("While the evidence regarding center of main interest is mixed, the court finds that the 'nerve center' for the Debtors is in Canada . . . the court concludes that, in these circumstances, the court should find that the center of main interests for a Texas incorporated entity should be Canada"); *In re Suntech Power Holdings Co.*, 520 B.R. 399 (Bankr. S.D.N.Y. 2014). ("[T]he court may consider the location of the debtor's 'nerve center,' including from where the debtor's activities are directed and controlled, in determining a debtor's COMI"); *In re British Am. Isle of Venice, Ltd.*, 441 B.R. 713, 720 (Bankr. S.D. Fla. 2010) ("in analyzing COMI courts have drawn a parallel to the 'nerve center' analysis described in a Hertz Corp.") (court applied nerve center analysis in COMI inquiry).

110.     These numerous factors point to Canada as the Chapter 15 Debtors' COMI. Numerous factors support the conclusion that the Chapter 15 Debtors' management is directed from, and their principal place of business or "nerve center" are located in, Canada:

- All directors and senior executive officers comprising the Management Team, as well as the vast majority of other officers of all the Debtor entities are based in Canada.

- All officers report directly to the Management Team, whose members are located in the Calgary Head Office.

- The Management Team develops all short, medium and long-term corporate strategies for the entire Sanjel Group.

- All annual and quarterly budgets are reviewed and approved by the Management Team.

- All policies, procedures, operating manuals and practices are developed, updated and administered by personnel located in the Calgary Head Office.

- Supply chain strategy and direction for the entire Sanjel Group are centralized in Calgary.

- Operational support and training for the entire Sanjel Group are administered out of the Pro Park facility in Calgary.

- All quality control of health, safety and environmental functions are centralized and administered from the Calgary Head Office.

- All bank accounts and the Cash Management System are controlled and/or administered by the treasury group located in the Calgary Head Office.

- All major receipts from the Chapter 15 Debtors, whether in Canadian or US dollars, are eventually concentrated into Canadian accounts.

- When in need of working capital funding, the Chapter 15 Debtors must draw on the Facility.  Draws under the Facility are advanced to Sanjel Corp. who then loans the funds to other members of the Sanjel Group.  Only Canadian personnel may authorize draws on the Facility.

- All payroll disbursements must be approved through Canadian personnel.

- Capital expenditures must be approved through Canadian personnel.

49

- All disbursements (except for petty cash disbursements) paid out by the Sanjel Group must be signed or electronically released by a member of the treasury team in the Calgary Head Office.

- While some cash receipts are deposited at the field locations where they are received, they are all reported to the treasury group in the Calgary Head Office and then administered as part of the centralized cash management system by the treasury group.

- The terms and provisions of all major customer contracts must be approved by Canadian personnel.

- Insurance contracts for the Chapter 15 Debtors are negotiated by Canadian personnel.

- Employee benefits and salaries are set by Canadian management.

- Books and records are maintained in Canada.

- The Chapter 15 Debtors auditor, Pennock Acheson Nielsen Devaney, Charterd Accountants, is based in Alberta, Canada.

- The Chapter 15 Debtors corporate legal counsel, Bennett Jones LLP, is based in Canada.

111.    The Chapter 15 Debtors operations and strategy are actively controlled and executed from Canada, which further bolsters the conclusion that the Chapter 15 Debtors principal place of business is Canada. *See Avalos v. Cont'l Airlines, Inc.*, 2011 U.S. Dist. LEXIS 62527, 5-7 (S.D. Tex. June 10, 2011) ("Continental has presented conclusive evidence that its . . . main activities — including management, human relations, legal services, payroll, and employee services — are all directed from Chicago.") (Court found nerve center was in

Chicago); *McCurdy v. Hydradyne, LLC*, 2013 U.S. Dist. LEXIS 163974, 6-8 (W.D. La. Nov. 18, 2013) ("LOR makes all business decisions affecting the operations, management, and ownership of its business interests in Atlanta.") (nerve center was Atlanta); *Ebert v. Desco Corp.*, 2010 U.S. Dist. LEXIS 56165 (N.D. W. Va. June 8, 2010) ("Under the 'nerve center' test . . . [t]he operational and financial management of the company is directed and controlled from Columbus, Ohio; mergers and acquisition functions performed by or for Bellofram Corporation are handled or managed from Columbus, Ohio; and administrative functions such as employee benefits, payroll administration, and legal services are performed in Columbus, Ohio.") (nerve center was Ohio). *See also Balachander v. AET Inc.*, 2011 U.S. Dist. LEXIS 109787 (S.D. Tex. Sept. 27, 2011) (adopting test from *Central West Virginia Energy Company v. Mountain State Carbon, LLC*, 636 F.3d 101 (4th Cir. 2011) ("the principal place of business . . . was not where the corporation's day-to-day management activities took place, but rather where the corporation's high-level officers directed, controlled, and coordinated its activities.")

112.    The four remaining factors also indicate that the Chapter 15 Debtors' COMI is in Canada.  With respect to the location of the debtors' headquarters, the Chapter 15 Debtor have various offices in the United States and Canada. However, as noted above, all of the Chapter 15 Debtors' senior executive officers and the vast majority of other officers are located in Calgary, Alberta, Canada and all major business decisions are made by personnel operating from Calgary. Likewise, as noted herein and sworn to in the *Declaration of Paul Crilly in Support of: (I) Petition for Recognition as Foreign Main Proceeding; (II) Application for Order to Show Cause with Temporary Restraining Order and Preliminary Injunctive Relief and (III) Other Pleadings Filed Concurrently Therewith* ("US Declaration"), the corporate headquarters for the Chapter 15 Debtors is located in Calgary, Alberta, Canada. *See Craig v. Worldwide Mixed*

*Martial Arts Sports Inc.*, 2014 U.S. Dist. LEXIS 92420 (D. Ariz. July 8, 2014) ("'Headquarters'

refers to a place from which something (such as a business) is controlled or directed.") (quoting

http://www.merriamwebster.com/dictionary/ headquarters {last visited Jan. 9, 2015)).

113.    As to the location of the debtor's assets, this factor also favors Canada, as the

majority of the Debtors' assets are located in Canada.  Additionally, the vast majority of, if not

all of, the intellectual property utilized by the Chapter 15 Debtors, in conducting their ongoing

business, is held in Canada.

114.    The location of the creditors favors Canada as the Debtors' COMI.  As indicated

above, approximately 58% of the trade creditors are located in Canada.  Also, a majority of the

Debtors' employees are based in Canada.

115.    The final factor, the jurisdictional law governing most disputes is arguably mixed.

The Chapter 15 Debtors are involved in multiple litigation matters in Canada, the United States,

and Mexico.  The Bond Agreement is governed by Norwegian law.  However, major decisions

regarding the Chapter 15 Debtors are made in Canada.  Also, the Facility, which represents

arguably the largest obligation of the Chapter 15 Debtors (and which is secured by virtually all of

the assets of Chapter 15 Debtors), is governed by Alberta law.

116.    Based upon the foregoing, most of the COMI factors conclusively establish

Canada as the COMI for the Chapter 15 Debtors. Additionally, the Chapter 15 Debtors "nerve

center" is in Canada.   Sanjel Corp. accordingly requests that the Canadian Proceedings be

recognized as a foreign main proceeding. *See Klytie's Developments, Inc.*, 383 B.R. at 781

(finding COMI in Canada notwithstanding the fact that two standards – the location of the

debtors' creditors and applicable law – yielded inconclusive results); *In re Gandi Innovations*

*Holdings, LLC*, 2009 Bankr, LEXIS 2751, 4-5 (Bankr. W.D. Tex. June 5, 2009) ("finding mixed

4837-7358-3152.1
113232\000001
04/04/2016 3:58 PM

factors for COMI, but finding that as "nerve center" for Canadian debtor group was in Canada and Texas incorporated entity was controlled through Canada that COMI for entity was in Canada.").

## VII. ALTERNATIVELY, THE CANADIAN PROCEEDINGS SHOULD BE RECOGNIZED AS FOREIGN NONMAIN PROCEEDINGS

117.    In the event this Court does not recognize the Canadian Proceedings as foreign main proceedings, the Monitor submits that the Canadian Proceedings should be recognized as a foreign nonmain proceedings.

118.    The Canadian Proceedings shall be recognized as a foreign nonmain proceeding if the Chapter 15 Debtors have an establishment in Canada. 11 U.S.C. § 1517(b)(2). "Establishment" is defined as any place of operations where the debtor carries out a nontransitory economic activity. 11 U.S.C. § 1502(2). When it is apparent that an entity conducts operations in the country where a foreign proceeding is pending, Courts will recognize the proceeding as a foreign nonmain proceeding if foreign main proceeding recognition is denied. *See e.g., SPhinX*, 351 B.R. at 122. Based upon the facts previously set forth, the Chapter 15 Debtors hold an "establishment" in Canada, and therefore the Monitor alternatively submits that recognition as a foreign nonmain proceeding is warranted.

## VIII.  FURTHER RELIEF REQUESTED

### A.    Automatic Relief When a Foreign Proceeding is Main

119.    Certain relief is automatic when a foreign proceeding is recognized as main. 11 U.S.C. § 1520(a). Upon recognition of a foreign proceeding that is a foreign main proceeding—

(1)    sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States;

(2)    sections 363, 549, and 552 apply to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate;

(3)    unless the court orders otherwise, the foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by sections 363 and 552; and

(4)    section 552 applies to property of the debtor that is within the territorial jurisdiction of the United States.

11 U.S.C. § 1520(a).

Accordingly, pursuant to 11 U.S.C. § 1520(a), the Monitor seeks such relief in the Proposed Order attached hereto as Exhibit A.

### B.    Automatic Relief Whether or not Foreign Proceeding is Main

120.    Certain relief is automatic upon recognition of a foreign proceeding, whether main or nonmain. Upon recognition of a foreign proceeding, the Monitor may intervene in any proceedings in a State or Federal court in the United States in which the debtor is a party. 11 U.S.C. § 1524. Upon recognition of a foreign proceeding, the Monitor has standing in a case concerning the debtor pending under another chapter of this title to initiate actions under sections 522, 544, 545, 547, 548, 550, 553, and 724 (a). 11 U.S.C. § 1523(a). Accordingly, the Monitor seeks such relief in the form of Proposed Order attached hereto as Exhibit A.

### C.    Discretionary Relief to Protect Creditors and the Chapter 15 Debtors

121.    Certain discretionary relief is available upon recognition of a foreign proceeding under 11 U.S.C. § 1521 as discussed below. The court may grant relief under section 1521 only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected. 11 U.S.C. § 1522(a). The Monitor contends that the discretionary relief requested is for the protection of the creditors and the Chapter 15 Debtors.

**D.      Discretionary Relief Whether or Not a Foreign Proceeding is Main**

122.    "Any appropriate" discretionary relief is available upon recognition of a foreign proceeding, whether or not a foreign proceeding is main. 11 U.S.C. § 1521(a) ("Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the Monitor, grant any appropriate relief").  In granting relief under 11 U.S.C. § 1521 to a representative of a foreign nonmain proceeding, the court must be satisfied that the relief relates to assets that, under the law of the United States, should be administered in the foreign nonmain proceeding or concerns information required in that proceeding. 11 U.S.C. § 1521(c).  That relief includes:

(1)     staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);

(2)     staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

(3)     suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

(4)     providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(5)     entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to foreign representative or another person, including an examiner, authorized by the court;

(6)     extending relief granted under section 1519(a); and

(7)     granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724 (a).

11 U.S.C. § 1521(a); *see also*, *In re Argent Energy (Canada) Holdings, Inc.*, Dkt. No. 73, Case No. 16-20060 (Bankr. S.D. Tex. Mar. 11, 2016) (recognizing CCAA proceeding as a foreign main proceeding but noting that even if it was a nonmain proceeding the Court would exercise discretion to grant all relief under 11 U.S.C. § 1520(a) (1-4)).

123.    In addition, under 11 U.S.C. § 1521(b), upon recognition of a foreign proceeding, whether main or nonmain, the court may entrust the distribution of all or part of the debtor's assets located in the United States to the Monitor or another person, including an examiner, authorized by the court, provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected. Accordingly, the Monitor seeks the above relief in the Proposed Order attached hereto as Exhibit A.

### E.    Injunction Standards

124.    Certain relief under section 1521 (the "<u>1521 Relief</u>") may require the application of standards for injunctive relief. The standards, procedures, and limitations applicable to an injunction may apply to relief under the following:

> 11 U.S.C. §§ 1521(a)(l) (concerning staying of proceedings not already stayed by section 1520(a));
>
> 1521(a)(2) (concerning staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a));
>
> 1521(a)(3) (concerning suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520 (a)); and
>
> 1521(a)(6) (concerning extending relief granted under section 1519(a)).

11 U.S.C.§ 1521(e).

### F.    Factors for Injunctive Relief

125.    The factors for injunctive relief are stated in *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1187 (5th Cir. 1979). They are discussed below.

126.    <u>A substantial likelihood of success on the merits</u>. There is no difficult real issue on whether the Canadian Proceedings should be recognized, as other courts have recognized CCAA proceedings and the proper documentation has been submitted. The Monitor also contends that the center of main interests is in Canada, since the headquarters, management, a

56

majority of its personnel are located in Canada and all major decisions are made in Canada. Accordingly, there is a substantial likelihood that the mandatory relief under Section 1520 will be ordered. There is a substantial likelihood that, with the 1521 Relief granted, the Chapter 15 Debtors, with the Monitor's assistance, will be able to successfully complete restructuring or sale as a going concern under the provisions of the CCAA in the Canadian Proceedings.

127.    A substantial threat of irreparable injury if the injunction is not issued. The Initial Order provides for a stay against seizure of assets and litigation similar to the automatic stay of 11 U.S.C. § 362(a). The Initial Order and papers submitted in conjunction therewith, establishes that the Debtors are currently insolvent and unable to pay their debts as they become due. The Monitor is concerned that these facts may cause creditors to seek prejudgment attachments and other remedies against the Chapter 15 Debtors and their assets in the United States. Through the Canadian Proceedings, the Chapter 15 Debtors will attempt to reorganize and/or sell their assets. If the 1521 Relief is not ordered, such restructuring and/or sale could be jeopardized.

128.    That the threatened injury to the movant outweighs any damage the injunction might cause to the opponent. Any threatened injury to the Chapter 15 Debtors outweighs any damage the injunction might cause to the opponents. The 1521 Relief would actually benefit the Chapter 15 Debtors' creditors by preventing the proverbial "race to the courthouse" by creditors and thus ensuring an equitable and orderly distribution of assets and facilitation of the Canadian Proceedings. *See In re Basis Yield Alpha Fund (Master)*, Case No. 07-12762 (Bankr. S.D.N.Y.) (stating that failing to issue a restraining order against creditors could, inter alia, "undermine [the] efforts to achieve an equitable result for the benefit of all of the Foreign Debtor's creditors.").

4837-7358-3152.1
113232\000001
04/04/2016 3:58 PM

129.  <u>That the injunction will not disserve the public interest</u>. The 1521 Relief will not disserve the public interest. The 1521 Relief is in the public interest as it will facilitate a cross-border reorganization that will provide a benefit to the estates of the Chapter 15 Debtors and their creditors. The 1521 Relief is supported by notions of comity and will allow the Chapter 15 Debtors to craft a productive solution for their estates.  These goals are consistent with the express objectives of Chapter 15 which include, *inter alia*, encouraging cooperation between the courts of the United States and courts of foreign countries, "fair and efficient administration of cross-border insolvencies," and "protection and maximization of the value of the debtor's assets." 11 U.S.C. § 1501(a).

130.  In sum, the relief sought is necessary and appropriate, in the interest of the public and international comity, consistent with the United States public policy, and will not cause any hardship to any party in interest that is not outweighed by the benefits of granting the requested relief.

## IX.  NO BOND

131.  The Monitor respectfully suggests that no bond be required under Fed. R. Bankr. P. 7065 and Fed. R. Civ. P. 7065(c).  A temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c). Fed. R. Bankr. P. 7065.  The Monitor, with enhanced powers, will be carrying out its duties under the CCAA and the Initial Order subject to the jurisdiction of the Canadian Court, and any bond would necessarily come from the Chapter 15 Debtors' assets and would represent unnecessary costs and expenses to the Chapter 15 Debtors.

132.  In the event that the Court finds that the Canadian Proceedings are foreign nonmain proceedings, the relief requested herein is still appropriate because the relief is

58

discretionary. *See* 11 U.S.C. § 1521 ("Upon recognition of a foreign proceeding, whether main or nonmain . . . the court may, at the request of Sanjel Corp., grant any appropriate relief . . . ."). Sanjel Corp. submits that the Court should exercise its discretion in this matter to assure an economical, expeditious, and equitable administration of the Chapter 15 Debtors' estate. Without such relief, the Chapter 15 Debtors will be exposed to the risk of voluminous litigation and other actions against their assets and Sanjel Corp. in the United States, which would result in a "race to the courthouse" among creditors and other parties in interest, and thus, threaten the. Chapter 15 Debtors' reorganization efforts.

## X.   COMITY

133.   If the court grants recognition, and subject to any limitations that the court may impose, consistent with the policy of Chapter 15, a court in the United States shall grant comity or cooperation to the foreign representative. 11 U.S.C. § 1509(b)(3). Consistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee. 11 U.S.C. § 1525(a). Accordingly, the Monitor seeks comity and cooperation of this Court with respect to the Canadian Court and its Initial Order.

134.   A central tenet of Chapter 15 is the importance of comity in cross-border insolvency proceedings. *Ad Hoc Group of Vitro Noteholders v. Vitro SAB De CV (In re Vitro SAB De CV)*, 701 F.3d 1031, 1053 (5th Cir. 2012).

The Supreme Court defined comity as follows:

> "Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

4837-7358-3152.1
113232\000001
04/04/2016 3:58 PM

*Hilton v. Guyot*, 159 U.S. 113, 143 (1895); *see also Vitro*, 701 F.3d at 1043-44.

135.    The exceptions to comity are construed especially narrowly when a court is asked to recognize judicial acts in Canada, a sister common law jurisdiction with procedures akin to those in the United States. *Clarkson Co. v. Shaheen*, 544 F.2d 624, 630 (2d Cir. 1976) (Clear and convincing evidence of fraud is required to successfully attack a foreign judgment; the court held that it would contravene the public policy of New York and the doctrine of comity not to recognize the Canadian judgment in these circumstances); *see also In re Petition of Davis*, 191 B.R. 577, 587 (Bankr. S.D.N.Y. 1996) (stating that "Courts in the United States uniformly grant comity to Canadian proceedings" and noting that Canada is a sister common law jurisdiction with the United States).

136.    The extension of comity to Canadian orders has continued since the 2005 enactment of Chapter 15. *See In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685, 698-99 (Bankr. S.D.N.Y. 2010) (extending comity to Canadian CCAA order providing for a third party release and citing numerous cases where American courts have extended comity to Canadian judgments); *Raymond Chabot, Inc. v. Serge Cote Family Trust*, 2014 U.S. Dist. LEXIS 117128, 6 (D.S.C. Aug. 22, 2014) (entering temporary restraining order assisting Canadian bankruptcy receiver and noting "the widely-accepted view that Canadian judgments are entitled to recognition and enforcement here"); *Collins v. Oilsands Quest, Inc.*, 484 B.R. 593, 597 (S.D.N.Y. 2012) (bankruptcy court enforced Canadian court stay from in CCAA noting "the question here is not whether this Court should grant a stay in the first instance, but whether should accord comity and deference to the stay orders entered by the Alberta Court. The Court concludes that in light of the comity principles laid out above, the Court must defer to the procedures set forth in the Canadian Proceedings and enforce the stay.").

60

## CONCLUSION

The Monitor respectfully requests that this Court recognize the Canadian Proceedings as foreign main proceedings, and grant the relief requested herein. The Monitor alternatively requests recognition as a foreign nonmain proceeding, and that the Court grant the relief requested herein. The Monitor further requests this Court to grant such other and further relief as it and the Chapter 15 Debtors may justly show themselves entitled to receive.

Dated: April 4, 2016             Respectfully submitted,

**DYKEMA COX SMITH**

By:    */s/ Deborah D. Williamson*
        Deborah D. Williamson
        State Bar No. 21617500
        Patrick L. Huffstickler
        State Bar No. 10199250
        Patrick B. McMillin
        State Bar No. 24088035
        112 East Pecan Street, Suite 1800
        San Antonio, Texas 78205
        (210) 554-5500
        (210) 226-8395 (Fax)
        dwilliamson@dykema.com

**COUNSEL FOR THE CANADIAN MONITOR AND FOREIGN REPRESENTATIVE**

## CERTIFICATE OF SERVICE

I certify a copy of the foregoing document will be served upon the persons entitled to notice by either U.S. First Class Mail, postage pre-paid, by electronic notification or by the Electronic Case Filing system for the United States Bankruptcy Court for the Western District of Texas and on the parties on the attached Initial Service List by U.S. First Class mail on or before April 4, 2016:

                   */s/ Deborah D. Williamson*
                   Deborah D. Williamson

4837-7358-3152.1
113232\000001
04/04/2016 3:58 PM

# INITIAL SERVICE LIST

COUNSEL FOR DEBTORS
VINSON & ELKINS LLP
Harry A. Perrin
John E. West
Reese A. O'Connor
First City Tower
1001 Fannin Street, Suite 2500
Houston, TX 77002-6760

VINSON & ELKINS LLP
Steven M. Abramowitz
David S. Meyer
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040

BENNETT JONES
Denise D. Bright
Chris D. Simard
John M. Mercury
4500 Bankers Hall East
855 2nd Street SW
Calgary, Alberta
T2P 4K7 Canada

COUNSEL FOR AGENT AND LENDER
Alberta Treasury Branches
WACHTELL, LIPTON, ROSEN & KATZ
Richard G. Mason
51 West 52nd Street
New York, New York 10019

BLAKE CASSELS & GRAYDON LLP
Kelly Bourassa
855 - 2nd Street S.W., Suite 3500 Bankers Hall East Tower
Calgary  AB  T2P 4J8
Canada

BLAKE CASSELS & GRAYDON LLP
Pamela L. J. Huff
199 Bay Street, Suite 4000  Commerce Court West
Toronto  ON  M5L 1A9
Canada
LANGLEY & BANACK
David S. Gragg
R. Glen Ayers Jr.
Langley & Banack, Incorporated
745 E. Mulberry, Ninth Floor
Trinity Plaza II
San Antonio TX 78212

NORDIC TRUSTEE ASA, INDENTURE TRUSTEE
TOGUT, SEGAL & SEGAL, LLP
Albert Togut
One Penn Plaza
Suite 3335
New York NY 10119

AD HOC BONDHOLDERS
C/O FRIED FRANK
Brad Eric Scheler
One New York Plaza
New York, New York 10004

MONITOR
PRICEWATERHOUSECOOPERS LLP
Paul J. Darby
Rick Osuna
Clinton L. Roberts
111-5th Avenue SW, Suite 3100
Calgary AB
Canada T2P 5L3

COUNSEL FOR MONITOR
BORDEN LADNER GERVAIS LLP
Josef G.A. Kruger, Q.C.
Robin Gurofsky
Centennial Place, East Tower, 1900
520 – 3rd Ave SW
Calgary, AB
Canada T2P 0R3

DYKEMA COX SMITH
Deborah D. Williamson
Patrick L. Huffstickler
Patrick B. McMillin
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205

INTERNAL REVENUE SERVICE
Centralized Insolvency Center
P.O. Box 7346
Philadelphia, PA 19101-7346

OFFICE OF THE U.S. TRUSTEE
Assistant U.S. Trustees
615 E. Houston St., Ste. 533
San Antonio, TX 78205

SECURITIES AND EXCHANGE COMMISSION
801 Cherry Street, Suite 1900, Unit 18
Fort Worth, TX 76102

UNITED STATES ATTORNEY GENERAL
Attorney General
United States Department Of Justice
Ben Franklin Station
P.O. Box 683
Washington, DC 20044

# LITIGATION PARTIES

Darell Davis
Kennedy Hodges, L.L.P.
Galvin B. Kennedy
711 W. Alabama Street
Houston, TX 77006

Frank Bryan
Loya & Associates P.C.
Raul Loya
10830 N Central Expy Suite 200
Dallas, TX 75231

Jesus Antonio
Miller & Bicklein, P.C.
Mark Anthony Cevallos
4555 E. University Avenue, Suite D-5
Odessa, TX 79762

Justice SWD, LLC
O' Tolle Law Firm
Loren J. O'Toole II
209 North Main
Plentywood, MT 59254

La Salle County, Texas
McGinnis, Lochridge & Kilgore, L.L.P.
Carlos R. Soltero
600 Congress, Suite 2100
Austin, TX 78701

La Salle County, Texas
Barron & Adler, LLP
Christopher J. Oddo
808 Nueces Street
Austin, TX 78701

Loretta Moores et al
The Carlson Law Firm
Scott R. Crivelli
400 W. Jasper Road
Killeen, TX 76542

Paul Ripp et al
Fitzpatrick, Skemp & Associates, LLC
Thomas E. Lister
123 South 7th Street
La Crosse, WI 54602

Preferred Sands of Canada, ULC, and Preferred Pipeline, LLC
Duane Morris LLP
Richard L. Renck
222 Delaware Ave, Suite 1600
Wilmington, DE 19801

Classification And Flotation Systems, Inc.
DeWitt Ross & Stevens S.C.
Harry E. Van Camp
Two East Mifflin Street, Suite 600
Madison, WI 53703-2865

Nancy Pelton and Manuel Montiel
Hommel Law Firm
William S. Hommel, Jr.
1404 Rice Road, Suite 200
Tyler, TX 75703

Christopher Keller
Kennedy Hodges, LLP
Galvin B. Kennedy
711 W Alabama St.
Houston, TX 77006

Shawn Hehir
North Dakota Department of Labour and Human Rights
Sarah Metzger
State Capital, 600 East Blvd Ave. Dept. 406
Bismarck, ND 58505-0340

Murray Norrington
Laurich & Associates
Mattew R. Laurich
115, 1925 18th Ave NE
Calgary, AB T2E 7T8
Canada

Ousmane Bah
21094-665 8th Street SW
Calgary, AB T2P 3K7
Canada

## 50 LARGEST UNSECURED CREDITORS

Hi-Crush Partners, LP
3 Riverway Suite 1350
Houston, TX 77056

SPM Flow Control Inc
601 Weir Way
Fort Worth, TX 76108

Santrol Inc.
Box 931184
Cleveland, OH 44193

US Silica Company
PO Box 933008
Atlanta, GA 31193

Frac Chem LLC
JP Morgan Chase Bank NA
PO Box 203019
Houston, TX 77216

Hexion Inc.
12850 Collection Center Dr
Chicago, IL 60693

Tutle & Tutle Trucking, Inc.
Joey Griffis
3672 HWY 67 West
Cleburne, TX 76033

Caron Transportation Systems USA, Inc
823 Highway 2
Bainville, MT 59212

Superior Silica Sand, LLC
Lonnie Culhanne
6000 Western Place, Suite 465
Fort Worth, TX 76107

Northern White Sand LLC
Richard Souddress
3811 Turtle Creek Blvd., Suite 1200
Dallas, TX 75219

Gardner Denver Petroleum Pumps
Box 955953
Saint Louis, MO 63195-5953

Engenium Chemicals Corporation
4333 - 46 Ave SE
Calgary, AB T2B 3N5
Canada

Preferred Pipeline LLC
One Radnor Coporate Center
100 Matsonford Road, Suite 101
Radnor, PA 19087

GCC Of America
PO Box 671507
Dallas, TX 75267-1507

Pel State Bulk Plant LLC
333 Texas St Suite 2121
Shreveport, LA 71101

Nalco Company
PO Box 70716
Chicago, IL 60673

Solaris Oilfield Site Services Operating, LLC
Cindy Durrett
8901 Gaylord Drive, Suite 210
Houston, TX 77024

Reagent Chemical & Research Inc.
PO Box 416228
Boston, MA 02241

SNF Inc.
Dustin Windham
PO BOX 404637
Atlanta, GA 30384-4637

Wells Fargo Equipment Finance Inc.
733 Marquette Avenue
Minneapolis, MN 55402

Unimin Corporation
PO Box 198867
Atlanta, GA 30384

Crown Supply Company
Michelle Olson
380 28 Road
Grand Junction, CO 81501

Badger Mining Corporation
Lonnie Culhanne
409 South Church Street
Berlin, WI 54923

Economy Polymers & Chemicals
PO Box 204019
Houston, TX 77216-4019

Star Bulk
4650 Fm 482
New Braunfels, TX 78132

Utex Industries Inc.
PO Box 4346
Dept 81
Houston, TX 77210

Johnson Oil Company
1113 N Sarah Dewitt Dr
Gonzales, TX 78629

Lehigh Inland Cement Ltd
Dan Thillman
PO Box 6979
Tacoma, WA 98417

Univar USA Inc
13009 Collections Center Dr
Chicago, IL 60693

Arepet Express LLC
#1010, 3900 N 10th Street
Mcallen, TX 78501

Grainger Inc.
Dept. 881208987
PO Box 419267
Kansas City, MO 64141-6267

Cemex Inc.
PO Box 73261
Chicago, IL 60673

Chieftain Sand & Proppant Barron LLC
Kelly Phillips
331 27th Street
New Auburn, WI 54757

SCIL - PETRO-KING INTERNATIONAL CO.
Unit 504, Tower 1, Silvercord, No. 30, Canton Road
Hong Kong,
Hong Kong

Lubrizol Oilfield Solutions, Inc.
Hank English
PO Box 677850
Dallas, TX 75267-7850

Jordan Sands, LLC
Jennifer Schwartz
1710 Roe Crest Drive
North Mankato, MN 56003

Flotek Chemistry, LLC.
PO BOX 677496
Dallas, TX 75267

Baker Petrolite LLC
PO Box 301057
Dallas, TX 75303-1057

Banc of America Leasing
PO Box 100918
Atlanta, GA 30384-0918

Black Gold Oilfield Services, LLC
150 Eagle Ave, Box 3
Fairbanks, AK 99701

Dow Chemical Company
PO Box 846028
Dallas, TX 75284-6028

Mi-Sher Fleet Specialist, Inc.
Tiffany Lowe
2765 S Florence Rd
PO Box 339
Ponder, TX 76259

CIT Equipment Finance
25978 Network Place
Chicago, IL 60673-1259

AI-Sealing LLC
Bill Froechtenicht
4706 Brookview Dr
Sugar Land, TX 77479

NOV Pressure Performance Systems
PO Box 200338
Dallas, TX 75320-0338

Short Elliot Hendrickson, Inc.
NW 6262
P.O Box 1450
Minneapolis, MN 55485-6262

Air Liquide Industrial U.S. LP
PO BOX 301046
Dallas, TX 75303-1046

Forum Energy Technologies
10344 Sam Houston Park Drive, Suite 300
Houston, TX 77064

Lewis-Goetz and Company, Inc. dba EVCO House Of Hose
PO Box 644819
Pittsburgh, PA 15264-4819

Gulfstream Services Inc.
PO Box 5041
Houma, LA 70361